**FOREST HILLS EARLY LEARNING CENTER, INC., et al., Plaintiffs,**

**v.**

**William L. LUKHARD, as Director of the Department of Social Services of the Commonwealth of Virginia, Defendant,**

**and**

**Grace Baptist Church, Tabernacle Baptist Church, Berean Baptist Church, and the Rock Church, individually and on behalf of all others similarly situated, Defendant-Intervenors.**

**Civ. A. No. 80–0116–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 15, 1987.

John E. Heintz, Popham, Haik, Schnob-rich & Kaufman, Washington, D.C., John Vanderstar, Covington & Burling, Washington, D.C., Hullihen W. Moore, Dennis O. Laing, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for plaintiffs Forest Hills Early Learning Center, Inc., et al.

Mary Sue Terry, Atty. Gen. of Va., James T. Moore, III, Sr. Asst. Atty. Gen., William L. Thurston, Asst. Atty. Gen., Guy W. Horsley, Sr. Asst. Atty. Gen., Peter R. Messitt, Asst. Atty. Gen., Office of Atty. Gen., Richmond, Va., for defendant William L. Lukhard.

Anthony F. Troy, David G. Shuford, George A. Somerville, Mays & Valentine, Richmond, Va., for defendant-intervenors Grace Baptist Church, Tabernacle Baptist Church, Berean Baptist Church, and The Rock Church.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court following a remand by the United States Court of Appeals for the Fourth Circuit. Plaintiffs are nonsectarian operators of child care centers. They brought this action challenging the constitutionality of Virginia's statutory exemption of religiously affiliated child care centers from the general licensing requirements imposed upon the operation of such centers by the Commonwealth. The action is nominally against the named Director of the Department of Social Services in his official capacity. The complaint seeks a declaration that the ex-

emption is unconstitutional and injunctive relief compelling general application of the child care licensing provisions to all child care centers irrespective of religious affiliation. Defendant-intervenors Grace Baptist Church, Tabernacle Baptist Church, Berean Baptist Church and The Rock Church represent a class of sectarian operators of child care centers that intervened to demonstrate the existence of free exercise rights in the exempted activities. For the reasons stated below, the Court concludes that the exemption statute, Va.Code § 63.1–196.3, violates the establishment clause of the First Amendment to the United States Constitution and enters judgment in favor of the plaintiffs.

### Procedural History

Plaintiffs Forest Hills Early Learning Center, Inc., Academy Day Care, Inc., and Holloman Child Care Centers, Inc. filed their original complaint against William Lukhard in his official capacity in 1979. United States District Judge Warriner held that, because the secular centers' claims of injury were pure speculation, they had no standing to sue. 480 F.Supp. 636 (E.D.Va. 1979). Plaintiffs filed a second complaint in 1980, alleging "substantial injury" but the District Court again held that plaintiffs lacked standing to sue. 487 F.Supp. 1378 (E.D.Va.1980). That decision was appealed to the United States Court of Appeals for the Fourth Circuit which held dismissal on that basis erroneous and remanded for further consideration of the standing issue on an expanded record. *Forest Hills Early Learning Center, Inc. v. Lukhard*, No. 80–1272 (4th Cir. Jan. 9, 1981) (unpublished), listed at 642 F.2d 448. On remand, the District Court denied defendant's motion to dismiss for lack of standing but granted defendant's motion for summary judgment. 540 F.Supp. 1046 (E.D.Va. 1982). The District Court held: (1) the exemption statute had a secular legislative purpose; (2) the statute's primary effect was not to advance religion; (3) the statute

did not foster excessive government entanglement with religion; (4) the statute did not violate the establishment clause; and (5) the statute did not violate the equal protection clause.

The plaintiffs appealed the judgment of the District Court to the Court of Appeals. The Fourth Circuit affirmed in part, vacated in part, and remanded to the District Court. 728 F.2d 230 (4th Cir.1984). The Fourth Circuit held that the Commonwealth of Virginia failed to establish the existence of free exercise rights justifying the exemption as an accommodation of free exercise rights. The Fourth Circuit noted that the accommodation of free exercise rights could provide a "saving 'secular purpose' for the exemption under establishment clause challenge." 728 F.2d at 241. The Fourth Circuit suggested class intervention of sectarian institutions to allow an efficient adjudication of the existence of any free exercise rights in the exempted activities, but instructed the District Court that if class intervention did not occur, it should enter judgment declaring the statute unconstitutional. *Id.* at 247.

On remand, the District Court denied class certification and entered summary judgment for the plaintiffs. On appeal, the Fourth Circuit stated that the District Court "misapprehended the purport of our decision and nullified entirely the purposes of a remand herein," necessitating return to the District Court once more "for the purposes stated in our earlier opinion herein." [1] 789 F.2d 295 (4th Cir.1986).

### Factual Background [2]

The Commonwealth of Virginia has regulated all child care centers since at least 1948 by requiring these centers to meet certain licensing standards. From 1968 to 1979, all persons who operated child care centers, without regard to sectarian or nonsectarian affiliation, were required to comply with the licensing requirements of Va. Code §§ 63.1–195 through 63.1–219 and the regulations promulgated thereunder. An

---

**1.** On remand, the case was transferred to United States District Judge Richard L. Williams, due to the death of Judge Warriner.

**2.** Much of this factual background is taken from the Fourth Circuit's opinion at 728 F.2d 230, 233–36.

applicant for a license under these provisions was required to submit an application to the Commissioner of the Department of Welfare[3] containing an outline of the center's proposed activities, facilities and services, § 63.1–197; the Commissioner was then required to investigate the applicant's proposal and to inquire into the character, reputation and financial responsibility of the applicant, § 63.1–198. The applicant was required to grant the Commissioner reasonable opportunity to inspect its facilities, books and records and to interview its employees and agents. *Id.*

If the Commissioner found that the applicant's operation was reasonably conducive to the welfare of the children it might serve and that the applicant's financial responsibility gave reasonable assurance of continued maintenance of its operation, the Commissioner was to issue a license, § 63.-1–199. The Commissioner retained the right to inspect the center and to interview any employee or customer of the center at reasonable times, § 63.1–210. In addition to complying with these statutory requirements, a person seeking a license for operating a center had to comply with regulations drawn up by the State Board of Welfare that prescribe general standards and policies for the operation of child care centers. *See* § 63.1–202.

During the early 1970's, the number of child care centers in Virginia increased significantly to meet the rising demand for outside-the-home child day care. As the number of centers increased, the Virginia Department of Welfare received numerous complaints that many of the centers were providing inadequate facilities, meals and supervision. Based upon an investigation, the Department determined that many centers were sacrificing the best interests of the children in order to maintain financial stability and to offer competitive prices. The Department further determined that many parents never visited a center before they enrolled their children there and that decisions concerning the choice of a center were often made without any parental knowledge or information about the centers.

The Department thereupon concluded that the regulations concerning licensing and operation should be upgraded to insure that the pressures of a competitive marketplace did not intrude upon the well-being of children utilizing the service of a center. In 1976, the State Board promulgated new and more stringent regulations. These regulations imposed substantial requirements on all child care centers in many areas, including space, health, safety, and nutritional standards, child/staff ratios, administrative structure, staff applications, parental participation, recordkeeping, program requirements, financial disclosure, disciplinary practices and others.

These standards were adopted in 1976 and applied to all child care centers, as had been the practice with prior regulations in the area. After the regulations were implemented a number of churches that operated child care centers opined to the Commissioner of the Virginia Department of Welfare, William L. Lukhard, that the new licensing requirements infringed their right freely to exercise their religious beliefs. In response to these complaints the Virginia legislature enacted Va.Code § 63.1–196.3, which exempts all "[c]hild care center[s] operated or conducted under the auspices of ... religious institution[s]" from compliance with the licensing requirements of § 63.1–196. Those requirements remained fully applicable to all nonsectarian child care centers, and, by express statutory provision, to any sectarian centers whose sponsors nevertheless elect to be covered. § 63.1–196.3 D.

Section 63.1–196.3, which is set forth in full in the Appendix to this opinion, does require the sectarian centers to meet several requirements but these requirements are minimal and consist mainly of compliance with generally applicable health and safety standards related to human occupancy and use of physical facilities. In lieu of apply-

---

**3.** The name of the Department of Welfare changed to Department of Social Services in 1984.

ing for and securing a license, the sectarian institutions have merely to file with the Commissioner of the Department of Social Services an initial and thereafter annual statement of intent to operate a child care center; certify that they have disclosed to all parents or guardians of enrolled children the qualifications of the staff personnel; present documentation of their tax-exempt status and of their compliance with local health and fire ordinances and with certain staff ratio requirements; and make public disclosure of certain aspects of their operations. If an exempt center fails to file the required statement of intent, the Commissioner may take "such action as he determines appropriate," including a suit to enjoin its operation. § 63.1–196.3 B. If a parent or guardian lodges a complaint with any local welfare, health, or fire department related to an exempt center's failure to comply with generally applicable health and safety regulations, those local agencies may inspect the center's facilities and take "appropriate action as provided by law, including a suit to enjoin the operation of the child-care center." § 63.1–196.3 C. These are the only official inspection and enforcement mechanisms provided for the exempt centers. In contrast to the nonsectarian centers, no state level inspection or enforcement mechanisms beyond that related to the filing statement requirement are provided for operation of the exempt centers.

A major revision of the minimum standards was initiated in 1982 when the Governor's Regulatory Reform Advisory Board selected the Department of Social Services for review of its regulations. In response to the Board's action, the Division of Licensing in the Department of Social Services developed a work plan for the evaluation of the Minimum Standards for Licensed Child Care Centers which was approved by the Governor in February 1983.

Over the next six months, the Division reviewed the child care center standards and submitted a report to the Governor's Advisory Board concerning them. In January 1984, the Division initiated a formal revision process by notifying all licensed centers and other interested parties that a revision of the standards was underway. It also formulated an ad hoc advisory committee of 21 members representing directors of child care centers, state and local government officials, specialists in child care development, and other interested community leaders. The ad hoc advisory committee reviewed the standards and recommended that certain standards be revised. The Division of Licensing prepared a rough draft of revisions in April 1984. That draft was reviewed by the ad hoc advisory committee, after which the Division formulated a preliminary draft for circulation to licensed centers and others for review and comment in June 1984.

After the informal comment period, the Division and the ad hoc advisory committee reviewed the comments and recommended final revisions. In November 1984, the Commissioner of the Department of Social Services sent draft revised minimum standards to the State Board of Social Services recommending that the draft be made the subject of formal public comment. The Board in turn approved the draft for public comment and public hearing. After the public comment and public hearing process, the Division of Licensing revised the draft a last time, submitted it for approval to the Governor's Regulatory Reform Advisory Board and the Department of Planning and Budget and once again to the State Board of Social Services. The revised standards were adopted by the State Board of Social Services on October 17, 1985, effective April 1, 1986.[4]

---

**4.** The minimum standards are located in the Appendix to this opinion. They can be summarized as follows: Part I—Introduction provides definitions, legal base, purpose and applicability of the standards. Part II—Administration explains sponsorship and operational, financial, and recordkeeping responsibilities. Part III—Personnel includes qualifications, health requirements, training, and personnel record requirements. Part IV—Supervision sets forth guidelines and ratio requirements. Part V—Physical Environment explains requirements regarding space, furnishings, equipment as well as requirements to insure safety, health and comfort. Part VI—Programs and Services deals with admission policies and procedures, health care, behavior management, food services, activities, and communication with parents. Part

As noted by the Fourth Circuit at 728 F.2d 236, the sectarian centers are totally relieved of official state regulation in the areas of licensing itself, and of program, insurance, financial resources and management, staff qualification, and internal administration following licensure, while the nonsectarian centers are subject to extensive regulation in these areas, enforceable by state agency inspection and legal sanctions. Sectarian centers have only limited disclosure and certification requirements and no sanctions exist as they do for nonsectarian centers.

In the area of health and safety, sectarian centers are also relieved of a wide range of regulatory standards which still apply to nonsectarian centers. Sectarian centers are subject only to those health and safety standards already applicable to the general population through local and state fire, safety, and sanitation codes. Nonsectarian centers are subject to state level inspection and enforcement mechanisms while sectarian centers are subject only to the inspection and enforcement powers of local health, welfare, and fire departments acting on complaints of parents.

Facing these differences in state regulation, plaintiffs brought this suit seeking a declaration that the exemption is unconstitutional and an injunction compelling application of the licensing provisions to all child care centers.

### Issues on Remand

■ In its first decision on the merits, the Fourth Circuit stated that the test of whether the exemption "impermissibly favors 'religion over non-religion'" is the three-part test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under that test, a statute is unconstitutional if it lacks a secular purpose, or if it has the primary effect of advancing religion, or if it fosters excessive governmental entanglement with religion. *Forest Hills Early Learning Center, Inc. v. Lukhard*, 728 F.2d at 238, citing *Lemon v. Kurtzman*, 403 U.S. at 612–13, 91 S.Ct. at 2111. The state argued that the

exemption statute advanced the secular purpose of accommodating the free exercise rights of church-run child care centers. Whether the asserted purpose justified the exemption, the Fourth Circuit concluded, would be determined by "whether and to what extent the free exercise rights accommodated by the exemption did in fact exist." *Id.* at 239.

Nothing in the Supreme Court's decision of *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), affects the Fourth Circuit's analysis of the focal issue. In that case, the Court applied the three-prong test of *Lemon v. Kurtzman* to determine whether a state statute authorizing a period of silence for meditation or voluntary prayer violated the establishment clause. With respect to the secular purpose test, the Court stated "it is appropriate to ask 'whether government's actual purpose is to endorse or disapprove of religion,'" citing Justice O'Connor's concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984). *Lynch v. Donnelly* also looked to *Lemon* for controlling law. In her concurrence, Justice O'Connor wrote:

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice on review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

465 U.S. at 690, 104 S.Ct. at 1368. It is clear from this statement that Justice O'Connor's question is but another way of asking whether the challenged statute has a secular or a religious purpose. This Court does not read Justice O'Connor's concurrence in *Lynch v. Donnelly* or the decision in *Wallace v. Jaffree* to reject or modify the secular purpose requirement.

Moreover, the Court in *Wallace v. Jaffree* specifically addressed the state's claim that the statute at issue served the secular

VII—Emergencies deals with training, equipment and procedures for emergencies.

purpose of accommodating religion. The Court concluded that that contention should be resolved by determining whether there was a need to relieve individuals from a government requirement because the requirement impeded their free exercise of religion. *Wallace v. Jaffree,* 472 U.S. at 57–58 n. 45, 105 S.Ct. at 2491 n. 45. That is precisely the analysis applied by the Fourth Circuit in its February 1984 decision in this case and the issue before this Court on remand. This Court concludes that *Wallace v. Jaffree* does not make any change in the pertinent law involved in this proceeding.

Accordingly, the issue before this Court is whether and to what extent free exercise rights expressed in exempt activities would be burdened by the application of the state's minimum standards for licensed child care centers to church-run centers and, if so, whether that burden is nevertheless justified by a compelling state interest.

### A. Class Certification

Pursuant to the mandate of the Fourth Circuit in *Forest Hills Early Learning Center, Inc. v. Lukhard,* 728 F.2d 230, defendant-intervenors filed a motion to certify a class. Evidence was heard and the Court conditionally certified the class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(c)(1), naming defendant-intervenors as class representative. After notice was given to the class members, identified as all sectarian child care centers currently exempt under Virginia Code § 63.1–196.3 and all sectarian child care centers that have applied for such an exemption, and responses were received, the Court found that Rule 23(a) and (b) requirements were satisfied and granted class certification.

The Court found that there exists a class of all religious institutions which operate or conduct child care centers, and which have been exempted from state licensure pursuant to § 63.1–196.3 of the Code of Virginia, or have filed documentation with defendant Lukhard indicating their intent to obtain such an exemption. Defendant-intervenors Grace Baptist Church, Berean Baptist Church, Tabernacle Baptist Church, and The Rock Church are members of this class.

The Court found that Rule 23(a) requirements were met. First, the number of sectarian child care centers that belong to the class renders joinder of all such centers in this action impracticable, satisfying the requirement of Fed.R.Civ.P. 23(a)(1). Second, there are questions of law and fact concerning the burden that would be imposed on religious beliefs by state licensure of child care centers under the minimum standards, the state's interest in regulating such centers, and the least restrictive means of satisfying the state's interests that are common to the class, satisfying Rule 23(a)(2). Third, the free exercise claims and defenses of the class representatives are typical of the claims and defenses of the class, satisfying Rule 23(a)(3). Finally, the class representatives more than fairly and adequately protect the interests of the class, satisfying Rule 23(a)(4).

Questions of law and fact common to the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this matter, satisfying Rule 23(b)(3). On this basis, the Court unconditionally certified the class with the defendant-intervenors, as class representative, charged with the task of presenting evidence to establish "the extent of any free exercise rights had by the sectarian institutions in the exempted activities...." 728 F.2d at 246.

### B. Standing

The issue of plaintiffs' standing, although resolved in an earlier stage of the proceedings, was raised by defendant-intervenors during the proceedings before this Court. As discussed in the procedural history, plaintiffs appealed to the Fourth Circuit following the District Court's granting a motion to dismiss for lack of standing in 1980. The Fourth Circuit vacated and remanded the case, directing plaintiffs to "allege 'specific, concrete facts demonstrating

that the challenged practices harm' them and that they 'personally would benefit in a tangible way from the Court's intervention,'" citing *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). That Court further noted that "submission of the proffered evidence and the particulars of the secular centers' actual financial loss, if any, would be appropriate before a decision about standing is made." *Forest Hills Early Learning Center, Inc. v. Lukhard,* No. 80–1272, slip op. at 3–4 (4th Cir. Jan. 9, 1981) [642 F.2d 448 (table)].

After plaintiffs supported their complaint with affidavits, the state's renewed motion to dismiss the complaint for lack of standing was denied. The District Court then upheld the constitutionality of the statute, but the Fourth Circuit vacated the summary judgment for the state, and remanded the case, concluding that "summary judgment might properly be granted to the nonsectarian plaintiffs on the present record." 728 F.2d at 233. Although the Fourth Circuit notes that "[n]o question of standing is now raised," that Court would not have been willing to grant summary judgment for the plaintiffs had the standing issue not been resolved in plaintiffs' favor. The summary judgment record, including the affidavits of financial injury, was the basis of the Fourth Circuit's decision that plaintiffs were entitled to summary judgment but for the decision to remand to allow intervention by a class of sectarian child care centers that could demonstrate the extent of any free exercise rights in the exempted activities. In the November 21 hearing on several motions filed by defendant-intervenors, this Court ruled that the issue had been resolved, noting that the requisite injury had been shown by the plaintiffs.

### C. Free Exercise Claims of Defendant-Intervenors

The tests to be applied to the churches' free exercise claims were set forth in *Forest Hills Early Learning Center, Inc. v. Lukhard,* 728 F.2d at 240–41. First, "the freedom to act upon religious beliefs—to engage in religious activity—is not abso-lute, as is the right to hold those beliefs; activity may be curtailed in some circumstances for the protection of sufficiently compelling societal interests. *Cantwell v. Connecticut,* 310 U.S. 296, 300–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)." The Fourth Circuit continues, "Whether state law impinges at all upon free exercise rights first depends upon whether 'the purpose or effect of [the] law is to impede the observance of ... religion.' (citations omitted). Whether, in turn, the holding or active expression of particular beliefs involves the observance of 'religion' depends upon the sincerity of the beliefs held and the centrality of those beliefs to an identifiable religious faith or commitment; only those laws that impede the holding or active expression of sufficiently sincere and central religious beliefs impinge upon free exercise rights," citing *Wisconsin v. Yoder,* 406 U.S. 205, 215–19, 92 S.Ct. 1526, 1533–35, 32 L.Ed.2d 15 (1972). The Fourth Circuit concludes, "If, under these tests, a particular law does impede 'religious' activity, even indirectly, it violates the free exercise clause, unless the impediment is justified by a compelling state interest arising from some substantial threat to public health, safety, peace, or order, (citations omitted) and is the least restrictive means for protecting the compelling state interest."

The Fourth Circuit also explained the issue of which activities of religious institutions are entitled to free exercise protections, noting first that "it could not be thought ... that *all* activities, or at least all 'good works' activities, of concededly religious institutions, are *per se* 'religious,' hence entitled to free exercise protections. This simply is not the law," *Forest Hills,* 728 F.2d at 242–43, citing *Walz v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). The explanation continues, "The rule instead is that some activities of undoubtedly 'religious' institutions may fall completely outside the realm of protected 'religion,' notwithstanding their undoubted legitimacy or manifest social value." Regarding this case, the Fourth Circuit concludes, "Nei-

ther, obviously, does the whole sweep of exempt activities here lie so manifestly at the core of religious practices—such as prayer, worship, and ritual—as to be entitled *per se* to protection." 728 F.2d at 243. *See also id.* at 246, n. 18, where the Fourth Circuit states that this Court must make a "general identification of those activities that are 'religious' and those that are not under free exercise doctrine," concededly involving "line-drawing between 'religious' and 'secular' activities of the sectarian child care center operations...."

■ The Court notes first in considering this issue that while it is bound by the factual matters stipulated to by the parties, it is not bound by any stipulations of legal conclusions. *See Dimidowich v. Bell & Howell,* 803 F.2d 1473 (9th Cir.1986); *Saviano v. Commissioner of Internal Revenue,* 765 F.2d 643 (7th Cir.1985). Therefore, to the extent the stipulations filed by the parties constitute factual matters, the Court incorporates those into its findings of fact found throughout this opinion. The specific statements that the Court considers to be conclusions of law rather than findings of fact are those statements in paragraphs 5 and 10 that the operation of child care centers by two of the defendant-intervenors is in each case a "part of its ministry." The Court also notes that paragraphs 18–21 of the stipulations are no longer applicable to the case since Shenandoah Baptist opted out of the class. With these corrections, the Court hereby incorporates the stipulations into its findings of fact.

■ Regarding the issue of whether the operation of child care centers by class members is a part of their respective ministries, this Court concludes that while the class members may characterize this activity as a part of their ministries, the Court is not bound to accept this characterization. Applying the tests set forth by the Fourth Circuit, the Court concludes that the operation of child care centers by these sectarian institutions is a secular, and not religious, activity. Therefore, the operation of such centers is not entitled *per se* to free exercise protection. The operation of a child care center is not an "active expression" of the churches' particular beliefs regarding their ministering to their children but is merely incident to such "active expression."

Although the Court assumes, without making a specific finding, the sincerity of the beliefs of the class, the Court concludes that operating a child care center is not an "active expression" of any centrally held religious beliefs of the class.

Although there are approximately 215 sectarian child care centers that are either exempted under Va.Code § 63.1–196.3 or have applied to be exempted, at least 106 church-run centers have chosen to obtain licenses rather than exemptions. While this is not conclusive, it is probative of whether operating a child care center is an active expression of centrally held religious beliefs. In addition, two defendant-intervenors—Berean Baptist and Tabernacle Baptist—applied for and accepted licenses for a period of time during the 1970's, indicating that there was no free exercise problem at that time. Moreover, child care centers are of recent origin, their numbers increasing during the 1970's as more mothers began to work outside the home. It would appear that sectarian groups, in establishing day care centers, were responding to a secular economic need rather than expanding the scope of their ministries. Despite this conclusion regarding the operation of child care centers by the sectarian institutions, this Court examines below the particular requirements the defendant-intervenors claim would impinge their free exercise rights.

### 1. The Licensing Requirement

The defendant-intervenors' central free exercise claim focuses on the licensing requirement itself. Virginia Code § 63.1–196 requires any operator of a child care center to obtain a license from the Commissioner of the Department of Social Services and to post that license in a conspicuous place on the premises. In the view of the churches, accepting a license from the state (1) requires that they acknowledge the lordship of the state over Jesus Christ and (2) gives

the state the right to say whether a church-run child care center can exist.

■ The state may regulate the secular activities of religious organizations as long as it does not infringe on the exercise of religious beliefs. *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). The Supreme Court has recognized that the state's power to regulate secular activities of religious organizations extends to private, religious schools. *Pierce v. Society of Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). Courts have upheld licensing requirements for church-run child care centers in four other states. *Department of Social Services v. Emmanuel Baptist Pre-School,* 150 Mich.App. 254, 388 N.W.2d 326, 330 (1986); *North Carolina v. Fayetteville Street Christian School,* 42 N.C.App. 665, 258 S.E.2d 459 (1979), *vacated and remanded on other grounds,* 299 N.C. 351, 261 S.E.2d 908, *vacated and remanded on other grounds following rehearing,* 299 N.C. 731, 265 S.E.2d 387, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980); *Kansas ex rel O'Sullivan v. Heart Ministries, Inc.,* 227 Kan. 244, 607 P.2d 1102 (1980); *Kansas ex rel Pringle v. Heritage Baptist Temple Inc.,* 236 Kan. 544, 693 P.2d 1163 (1985); *Texas v. Corpus Christi People's Baptist Church, Inc.,* 683 S.W.2d 692 (Tex.1984); *Roloff Evangelistic Enterprises, Inc. v. Texas,* 556 S.W.2d 856 (Tex.Civ.App.1977), *appeal dismissed,* 439 U.S. 803, 99 S.Ct. 58, 58 L.Ed.2d 96, *rehearing denied,* 439 U.S. 998, 99 S.Ct. 601, 58 L.Ed.2d 672 (1978).

■ As stated above, this Court concludes that the operation of a child care center, even by a church, is a secular activity not entitling it to free exercise protection. Thus, requiring a church-run child care center to obtain a license to participate in such a secular activity does not burden the free exercise of religion by that church.

The defendant-intervenors' views on licensing did not prevent two of them—Berean Baptist and Tabernacle Baptist—from applying for and accepting licenses for a period in the 1970's. Neither church raised a free exercise objection to the licensure requirement during their period of licensed operation. As the pastors of these churches went through the evolutionary process of acquiring spiritual and political maturity, their institutional positions changed. Their churches went from a position of compliance with the state's mandated licensing requirements to a view that such requirements were an intrusion by the state into their ministries and indeed an attempt by the state to license the pulpit.[5]

What prompted Berean Baptist to return its license and apparently what concerns the other churches as well was a concern that the state can arbitrarily deny a license to a church-run center. This concern is unfounded as a matter of fact and of law. There was no evidence that the state had ever arbitrarily acted to restrict the ability of church-run child care centers to operate their programs according to the mandates of their religious beliefs. Moreover, the churches' concerns are fully addressed by the procedural, statutory and constitutional safeguards that govern the state's conduct with respect to licensing. First, the Administrative Process Act, Va.Code § 9–6.-14:1 et seq., and the Public Participation Process govern the promulgation of standards for a licensed facility. The record establishes that the state met and exceeded these requirements when promulgating the standards now in effect. Second, the Division of Licensing may revoke or deny a license to an applicant only when it determines that the applicant does not substantially meet the requirements for a license. Third, an applicant whose license is denied or revoked is entitled to appeal that decision in accordance with the Administrative Process Act and may continue to operate during the pendency of such an appeal. Next, the applicant may appeal an adverse decision from an administrative hearing to the Circuit Court, pursuant to Va.Code

5. *See* defendant-intervenors' exhibit 18, an excerpt from Dr. Rodney Bell's Bible, which contains his notation: "6/2/78 2:33 a.m. Here I stand! I can do no other. The State of Va. will not license this pulpit! 'By the Grace of God!' I will 'Rot in Jail First.' R. Bell."

§§ 63.1–180 and 63.1–213. In addition, the state's conduct is subject to the due process requirements of the United States and Virginia Constitutions. Thus, the state is not free to arbitrarily decide that a particular church-run child care center can or cannot exist.

█ The Court concludes that the act of licensing a church-run child care center to certify compliance with health, safety and welfare standards would not burden the church's free exercise of religion and would not empower the state to arbitrarily deny a license to an applicant on the basis of the applicant's religion or on any other ground.

█ Even assuming *arguendo* that the operation of a child care center is a religious activity rather than a secular activity, entitling it to free exercise protection, the licensure requirement's impediment of the free exercise of this activity is justified by the compelling state interest in protecting the health and safety of children and is the least restrictive means for protecting this interest.

The state's compelling interest in protecting the health and safety of children, particularly those under the age of five, in child care outside the home is clear. Indeed, the churches acknowledge the state's compelling interest in this regard.

The state's licensing standards are directed to the protection and promotion of the physical well-being of children in child care outside the home. The minimum standards focus predominantly on the quality of a center's physical facilities and environment, the provision of trained adult supervision sufficient in number for the ages and number of children at the center, the provision of nutritious meals, and the protection of children's health. Although these standards are more detailed in breadth and scope than the requirements imposed upon exempt centers under the exemption statute, they reflect the same basic objective of promoting the health and welfare of children in child care. The churches do not object to the imposition of the requirements contained in the exemption statute or other state regulations aimed at protecting the health and safety

of children. Indeed, most of the pastors who testified would not object if the requirements of the minimum standards, with the exception of the specific requirements to which they object, were imposed upon them as part of the exemption statute requirements. The licensing requirement is a reasonable way of assuring and informing consumers that all child care centers in the state meet these standards.

The state's licensing process is the least restrictive means of assuring that all children placed in child care are served in a safe, fit and nurturing environment. If a state is prohibited from acting prospectively to ensure compliance with minimum standards designed to protect children, and is only allowed to act after finding a violation of those standards, the state's effort to prevent physical and emotional harm to children would be seriously eroded. The state would only be able to act after the damage is done. Certification of compliance with minimum standards in advance of the provision of child care services is the only way the state can prevent harm to children in child care centers. Thus, even assuming that the licensure requirement burdens the free exercise of religion, that burden is permissible under the First Amendment.

### 2. The Financial Disclosure Requirement

Virginia Code § 63.1–198 requires the Commissioner of the Department of Social Services to investigate the financial responsibility of an applicant for a child care center license. The minimum standards require an applicant to submit "a projected budget detailing expected income and expenses at the proposed center for the first year of operation; and a complete balance sheet showing separately the current assets committed to, and current liabilities charged against, the proposed center." *See* Minimum Standards, § 2.7(1) and (2).

█ The Court concludes that requiring a church-run child care center to submit a statement of estimated expenditures and revenues and of assets and liabilities, prior

to its first year of operation would not burden a church's free exercise of religion. The information requested by the state on its one-page financial disclosure form represents a minimal intrusion into the financial affairs of one secular activity conducted by a church—its child care center— while serving the purpose of assuring a center's financial ability to comply with the standards.

Moreover, even assuming that the operation of a child care center is a religious activity, entitling it to free exercise protection, the financial disclosure requirement is justified by the state's compelling interest in the protection of children. In addition, this requirement is the least restrictive means for protecting this interest.

This requirement serves the purpose of insuring that a new child care center will be able to operate in compliance with the minimum standards for at least one year despite the heavy start-up costs of a new center. Resources must be available to assure adequate care and protection of the children during the first year of operation. As explained in a Division of Licensing Programs document, "Issuing a license to a facility that lacks the financial ability to meet the standards could pose a serious threat to the well-being of children in care. This risk can be avoided by identifying the problem before it occurs and by delaying licensure until the sponsor has the necessary resources."

The churches argue that the state does not need this information since they would subsidize their child care centers to stay in operation. This fact would support a showing of financial ability to operate, but it does not obviate the state's concern that such ability be demonstrated.

This requirement is clearly the least restrictive means for protecting the state's interest. The financial information is requested only at the beginning of a center's operation, unless a center demonstrates an inability to comply with the minimum standards at a later date that might be caused by financial problems. The record here indicates that the two churches whose centers were licensed during the 1970's com-

plied with the financial disclosure requirements without objection when they first applied for their licenses. The record also indicates that financial information was not requested after their initial application. Finally, the information requested by the state is less detailed in form and substance than the information churches are required to provide on the application for an exemption for taxation under Internal Revenue Code § 501(c)(3).

Thus, the Court concludes that the financial disclosure requirements do not interfere with the free exercise of religion, serve the state's compelling interest in protecting children by ensuring financial ability to operate and comply with the minimum standards, and are the least restrictive means for establishing this ability.

### 3. The Prohibition of Corporal Punishment

Section 6.20 of the Minimum Standards provides:

"There shall be no physical punishment or disciplinary action administered to the body such as, but not limited to, spanking; forcing a child to assume an uncomfortable position (e.g., standing on one foot, keeping arms raised above or horizontal to the body); restraining to restrict movement through binding or tying; enclosing in a confined space, box, or similar cubical; or using exercise as punishment."

The churches' objection to this section is based on the Biblical command "Spare the rod, spoil the child."

■ The Court concludes that requiring a church-affiliated child care center to refrain from corporal punishment does not burden the free exercise of religion by that church. Because the operation of a child care center is a secular activity, even when conducted by a church, there is no *per se* entitlement to free exercise protection for all activities conducted within that operation.

Even assuming *arguendo* either (1) that the operation of a child care center is a religious activity, or (2) that to the extent a

church-run child care center believes it is commanded by the Bible to use spanking as a form of punishment, the prohibition against corporal punishment would burden that church's free exercise of religion, the corporal punishment prohibition's burden on free exercise is justified by the compelling state interest. The Court concludes that the state has a clear and compelling interest in protecting young children in care away from home from physical and emotional harm. That interest is served by prohibiting physical punishment which risks serious physical and mental harm and child abuse, without fostering the development of self-discipline. The record clearly establishes the state's concerns. Spanking a child on the bottom with a hand or object can cause welts, bruises or bleeding depending on the degree of force used. If the spanking is particularly forceful, it can cause permanent, internal damage to the muscles of the buttocks. Blows to the buttocks may cause damage to bones, nerves and even the genitals. Corporal punishment teaches children that aggressive physical behavior is a viable means to resolve problems with other people.

The record also reflects the state's concern that corporal punishment is closely associated with child abuse, a serious problem that has received nationwide public attention in recent years. Indeed, the state's concern about child abuse is so serious that it has enacted a statute requiring any adult responsible for the care of a child away from home to report any known or suspected incidents of child abuse to public authorities. Even some of the churches that object to the prohibition of corporal punishment believe that it should be used sparingly under strict limitations. Thus they have strictly limited the instances in which they permit the use of corporal punishment by requiring prior parental consent, limiting its use to designated staff and requiring the presence of another adult.

█ Where religious practices risk or endanger the health and well-being of members of society, the state may regulate such practices to avoid the adverse health

consequences. *See, e.g., Kansas ex rel. Pringle v. Heritage Baptist Temple, Inc.,* 236 Kan. 544, 549–550, 693 P.2d 1163 (1985); *Department of Social Services v. Emmanuel Baptist Pre-School,* 388 N.W.2d at 334. The prohibition of corporal punishment in child care centers is precisely such an instance. The Court concludes that the state's prohibition against corporal punishment is justified by a compelling state interest in protecting young children from physical and emotional harm. No other method of preventing the harm from occurring is available to achieve this interest. Thus, this prohibition may be applied to church-run centers despite the possible burden on their religious conduct.

Moreover, a church subject to licensure could seek a variance from the Department of Social Services to permit it to use corporal punishment under appropriately defined circumstances acceptable to the state. That would permit the state to ensure that centers using corporal punishment because of their religious beliefs do so in ways that minimize the risks associated with corporal punishment.

### 4. Child Abuse Reporting Requirements

█ Virginia Code § 63.1–248.3 requires, *inter alia,* "any person providing full or part-time child care for pay on a regularly planned basis ... who has reason to suspect that a child is an abused or neglected child, shall report the matter immediately except as hereinafter provided, to the local department of the county or city wherein the child resides or wherein the abuse or neglect is believed to have occurred." Although the churches have raised objections about the requirement set forth in the minimum standards concerning staff training in procedures for reporting suspected instances of child abuse to the appropriate public authority, the reporting requirement is a statutory requirement that applies to exempt centers without regard to licensing requirements. Moreover, all of the churches recognize the importance of reporting instances of known or suspected child abuse to the appropriate authorities. They object only to being required to do so before they have had an

opportunity to "minister" to the family involved. The Court does not see how the reporting requirement prevents churches from ministering to the families with child abuse problems. The state's overriding interest in stopping child abuse and preventing additional harm overrides any minimal burden a church staff might suffer on account of the reporting requirements. Accordingly, the Court concludes that the reporting requirements do not burden the churches' free exercise of religion, are justified by a compelling state interest in protecting children from physical harm and abuse, and are the least restrictive means available for protecting this interest.

5. The "Good Moral Character" Requirement

Virginia Code § 63.1–198 requires the Commissioner to investigate the character and reputation of an applicant for a child care center license. In furtherance of that requirement, Section 3.1 of the Minimum Standards provides that no staff member "shall have been convicted of a felony or misdemeanor related to abuse, neglect, or exploitation of children or adults" and that all staff shall be "of good moral character and reputation." *See also* Part 2, Article 1, Section 2.3 of the Minimum Standards. The churches object to these requirements because they believe in the fact that a "person can be regenerated, born again, have a new beginning." The churches believe that they should be free to determine whether a person has been born again and should be hired in the child care center. According to the churches' view, the minimum standards would prevent them from hiring the Apostle Paul. With one exception, the churches do not assert that any of their present personnel would be barred from employment by the minimum standards, and the Division would not object to the employment of that individual. The minimum standards encompass only felonies and misdemeanors related to the abuse, neglect or exploitation of children and adults.

The churches express three fears: (1) that the state would prevent them from applying a stricter test of character than

set forth in the standards; (2) that the state might prevent them from hiring an individual whom they deemed to be of good moral character but who might not be deemed to be of good moral character by the state; or (3) that the state might compel them to hire someone they believed lacked good moral character.

■ To the extent that the churches would impose a stricter test of good moral character than the state does, there is nothing in the standards to suggest that the state could or would prohibit them from doing so. Thus, that objection does not raise a free exercise concern. To the extent that a church might want to hire someone whose previous conduct suggests a lack of good moral character but whose subsequent conduct in the church's view evidences good moral character because the individual has been converted and since lived an exemplary Christian life, there is nothing in the minimum standards to suggest that a church would be prevented from hiring such a person. Moreover, this Court will not presume that the Department of Social Services would apply the minimum standards so as to preclude hiring such an individual or that it would deny a request for a variance by a church-run center to hire someone the church has determined has good moral character, despite prior conduct that might suggest the contrary.

■ The Court must also reject the contention that the good moral character standard would enable the state to compel a church-affiliated child care center to hire someone the church felt lacked good moral character. In particular, the churches fear that the state might seek to compel a church to hire a homosexual, even if the church believed homosexuality is immoral. Their fear is based on the fact that the state has a policy against discrimination against homosexuals in public school employment. The fact that the state does not discriminate against homosexuals in public school employment does not support the churches' contention that the Division of Licensing Programs of the Department of

Social Services could compel a private child care center that receives no public funding to hire a homosexual. The minimum standards contain no provision that would require a licensed center to hire someone it did not want to hire. Accordingly, the Court concludes that the good moral character requirements do not impermissibly burden the free exercise of religion by these centers.

### 6. Program Requirements

■ Section 6.28 of the Minimum Standards requires licensed centers to provide "experiences which promote growth, well-being, and the appropriate development of growth and fine motor skills; language skills; cognitive skills; social and emotional skills; positive self-concept, curiosity, interest and exploration." The churches fear that the minimum standards would permit the state to impose program content requirements that reflect a secular humanism philosophy, a philosophy they believe is incompatible with their religious beliefs. The minimum standards do not regulate the substantive content of a child care center's program, however. The standards concerning programming and activities are designed to foster the physical and mental development of children by encouraging centers to provide a broad range of activities, without directing the content or substance of such activities. No evidence was presented at trial to suggest that the state has used the licensing process and applied the standards to direct, limit or regulate the religious content or teachings of any child care program subject to the minimum standards. None of the church-run centers that were licensed during the 1970's indicated that the state sought to affect the religious content of their child care programs or to impose its own religious views on the programs of the church run centers. In fact, two of the plaintiffs include religious material—through Bible readings and prayer—in their programs. Therefore, the Court concludes that the risk that the state would interfere with the religious content and program of a church-run child care center is remote and speculative. Thus, there is no basis to conclude that application of the standards to church-run centers would burden their free exercise of religion or impose contrary religious views on their programs.

Section 6.34(2) of the Minimum Standards requires licensed centers to include rhythm, music, and dancing in the daily activities of its program. The churches object to this provision because they are concerned that the state might require them to expose children to rock and roll music and dancing, which they believe to be sinful.

■ The churches' objections to these specific program standards are based on a concern about the manner in which they might be applied and not on a belief that the state does and would apply the standards to their centers in a manner that would infringe on their free exercise of religion. Thus, the churches object to the standard requiring the promotion of "positive self-concept" because they cannot know "whether the state would interpret . . . these subjective standards in ways that would conflict with our disciplinary philosophy or belief in the depravity of man." The Court finds no basis to conclude that the state would apply the standards at issue in a manner that would interfere with their belief in the depravity of man, or their teaching of that belief in their centers. Similarly, the churches' objection to the rhythm and music standard is premised on the unfounded notion that the state can and would dictate that churches engage in musical activities they believe to be sinful. There is no evidence that the state seeks to do so through the licensing standards at issue. Accordingly, the Court concludes that the churches' objections on these grounds do not establish a free exercise violation.

### Conclusion

In accordance with the findings of fact and conclusions of law stated in this opinion, the Court concludes that the statute, Va.Code § 63.1–196.3, lacks a secular purpose and therefore violates the establishment clause of the First Amendment to the

United States Constitution. While the statute's avowed secular purpose was to accommodate free exercise rights in the exempted activities, the Court finds no *per se* entitlement to free exercise protection for the operation of child care centers by sectarian institutions. Moreover, the Court concludes that, even assuming entitlement to free exercise protection for some of the exempted activities, any burden on free exercise is justified in every case by the compelling state interest. Thus, the statute, found by the United States Court of Appeals for the Fourth Circuit to be "unconstitutionally overbroad under the establishment clause," cannot be salvaged by defendant-intervenors' attempt to establish free exercise rights.

The Court enjoins the Commissioner of the Department of Social Services of the Commonwealth of Virginia from enforcing Va.Code § 63.1–196.3 and orders general application of the child care licensing provisions to all child care centers.

An appropriate order shall enter.

### APPENDIX A

**§ 63.1–196.3. Child-care center operated by religious institution exempt from licensure; annual statement and documentary evidence required; enforcement; injunctive relief.**—A. Notwithstanding any other provisions of this chapter, a child-care center operated or conducted under the auspices of a religious institution shall be exempt from licensure as required by § 63.1–196. Such religious institution shall file with the Commissioner of Welfare, prior to beginning any such operation and thereafter annually, a statement of intent to operate a child-care center, certification that the child-care center has disclosed to the parents or guardians of the children in the center the qualifications of the personnel employed therein and documentary evidence that:

1. Such religious institution has tax exempt status as a nonprofit religious institution in accordance with § 501(c) of the Internal Revenue Code of 1954, as amended, or that the real property owned and exclusively occupied by the religious institution is exempt from local taxation.

2. Within the prior ninety days, the local health department and local fire marshal or Office of the State Fire Marshal whichever is appropriate, have inspected the physical facilities of the child-care center and have determined that the facility is in compliance with applicable laws and regulations with regard to food service activities, health and sanitation, water supply, building codes, the Virginia Fire Safety Regulations or the Uniform Statewide Building Code and local fire requirements.

3. The child-care center employs supervisory personnel according to the following ratio of adults to children:

a. One adult to four children from zero to twenty-four months.

b. One adult to ten children from ages twenty-four months to six years.

c. One adult to twenty-five children ages six years and older.

Each person in a supervisory position shall be certified by a practicing physician to be free from any disability which would prevent him from caring for such children as will be under his supervision.

4. The following aspects of the child-care center's operations are described in a written statement provided to the parents or guardians of the children in the center and made available to the general public: physical facilities, enrollment capacity, food services, health requirements for the staff and public liability insurance.

B. If a religious institution operates a child-care center and does not file the statement and documentary evidence required by paragraph A hereof, the Commissioner shall give reasonable notice to such religious institution of the nature of its noncompliance and may thereafter take such action as he determines appropriate, including a suit to enjoin the operation of the child-care center.

C. Any parent or guardian of a child in a child-care center who has reason to believe that a child-care center falling within the provisions of this section is not in compliance with the requirements of paragraph A of this section may report the same to

the local department of welfare, the local health department or the local fire marshal, each of which may inspect the child-care center for noncompliance, give reasonable notice to the religious institution, and thereafter may take appropriate action as provided by law, including a suit to enjoin the operation of the child-care center.

D.   Nothing in this section shall prohibit a child-care center operated by or conducted under the auspices of a religious institution from obtaining a license pursuant to chapter 10 (§ 63.1–195 et seq.) of Title 63.1 of the Code.   (1979, c. 425.)

## APPENDIX B

### MINIMUM STANDARDS FOR LICENSED CHILD CARE CENTERS
Adopted by the State Board of Social Services
October 17, 1985
Effective
April 1, 1986

VIRGINIA DEPARTMENT OF SOCIAL SERVICES
DIVISION OF LICENSING PROGRAMS
8007 DISCOVERY DRIVE
RICHMOND, VIRGINIA 23288

### TABLE OF CONTENTS

Page

Part I   INTRODUCTION .............................................. 318
    Article 1.   Definitions .............................................. 318
    Article 2.   Legal Base ............................................. 319
    Article 3.   Purpose ................................................ 319
    Article 4.   Applicability .......................................... 319
Part II   ADMINISTRATION .......................................... 320
    Article 1.   Sponsorship ........................................... 320
    Article 2.   Operational Responsibilities ............................ 321
    Article 3.   Financial Responsibilities ............................. 321
    Article 4.   Record Keeping Responsibilities ......................... 321
Part III   PERSONNEL ............................................... 322
    Article 1.   General Qualifications ................................. 322
    Article 2.   Personnel Records ...................................... 322
    Article 3.   Health Requirements ................................... 322
    Article 4.   Staff Training ......................................... 323
    Article 5.   Administrative Staff ................................... 324
    Article 6.   Program Staff ......................................... 324
    Article 7.   Volunteers and Volunteer Personnel ..................... 325
Part IV   SUPERVISION .............................................. 325
    Article 1.   General Supervision .................................... 325
    Article 2.   Staff to Children Ratio Requirements .................... 325
    Article 3.   Ratio During Rest Periods .............................. 326
    Article 4.   Supervision During Swimming and Wading ................ 326
Part V   PHYSICAL ENVIRONMENT .................................... 326
    Article 1.   Safety, Health and Comfort ............................. 326
        § 5.3   Building Construction and Maintenance ............. 326
        § 5.4   Grounds ................................................ 327
        § 5.5   Sanitation ............................................. 327
        § 5.6   Lighting ............................................... 327
        § 5.7   Temperature and Ventilation ....................... 327
        § 5.8   Equipment and Materials ........................... 327

| | | Page |
|---|---|---|
| Article 2. | Space, Furnishings, Equipment, and Materials | 328 |
| | § 5.9 Group Activity Areas | 328 |
| | § 5.10 Areas for Sleep and Rest | 329 |
| | § 5.11 Quiet, Private Area | 330 |
| | § 5.12 Bathroom Facilities | 330 |
| | § 5.13 Food Service Areas | 331 |
| | § 5.14 Storage | 331 |
| Part VI PROGRAMS AND SERVICES | | 331 |
| Article 1. | Admission Policies and Procedures | 331 |
| | § 6.1 Identifying Information for Each Child | 331 |
| | § 6.2 Agreements/Authorizations | 332 |
| | § 6.3 Assessment and Initial Plan of Care | 332 |
| | § 6.4 Physical Examinations/Immunizations | 332 |
| Article 2. | Health Care | 333 |
| | § 6.5 Medical Reports After Admission | 333 |
| | § 6.6 Medication | 333 |
| | § 6.7 Special Care Provisions to Prevent the Spread of Disease | 334 |
| Article 3. | Communication with Parents | 334 |
| Article 4. | Management of Behavior | 335 |
| Article 5. | Nutrition and Food Services | 335 |
| | § 6.24 Meals and Snacks | 335 |
| | § 6.25 Special Food Service Needs | 336 |
| | § 6.26 Infant and Toddler Food Service Needs | 336 |
| | § 6.27 Contract Food Services | 337 |
| Article 6. | Resting | 337 |
| Article 7. | Activities | 339 |
| Part VII EMERGENCIES | | 339 |
| Article 1. | Specialized Staff Training | 339 |
| Article 2. | Equipment for Emergencies | 339 |
| Article 3. | Procedures for Emergencies | 339 |

## VR 615–23–02. MINIMUM STANDARDS FOR LICENSED CHILD CARE CENTERS

### PART I INTRODUCTION

#### Article 1 Definitions

§ 1.1

The following words and terms when used in these regulations shall have the following meanings unless the context indicates otherwise:

"Administrator" means the staff person responsible for the day-to-day operation and management of a child care center.

"Adult" means any individual 18 years of age or over.

"Age groups"

"Infant" means children from birth up to 16 months.

"Toddler" means children from 16 months up to two years.

"Preschool" means children from two years up to the age of eligibility to attend public school.

"School age" means children from the age of eligibility to attend public school and older.

"Age of eligibility to attend public school" means five years old by November 30, 1986* as determined on the first day of the fall term of each school year.

* In 1987 this date changes to October 31.

In 1988, and thereafter, this date changes to September 30. (§ 22.1–199 of the Code of Virginia)

"Aide" means the individual responsible for assisting the Child Care Supervisor in program implementation and supervision of children.

Note: Position titles used in these standards are descriptors only and do not preclude the use of other titles by centers.

"Character and reputation" means that findings have established that knowledgeable and objective people agree that the subject maintains business/professional, family, and community relationships which are characterized by honesty, fairness, truthfulness, and a concern for the well-being of others to the extent that the subject is considered suitable to be entrusted with the care, guidance, and protection of children.

"Child" means any individual under 18 years of age (§ 63.1–195 of the Code of Virginia).

"Child care supervisor" means the individual responsible for assisting in program implementation and supervision of children.

"Commissioner" means the Commissioner of Social Services, also known as the Director of the Virginia Department of Social Services.

"Department" means the Virginia Department of Social Services.

"Department's representative" means an employee or designee of the Virginia Department of Social Services, acting as the authorized agent of the Commissioner in carrying out the responsibilities and duties specified in Chapter 10 of Title 63.1 of the Code of Virginia.

"Evening care" means care provided in a center between the hours of seven p.m. and one a.m., inclusively.

"Licensee" means any individual, partnership, association, or corporation to whom the license is issued.

"Overnight care" means care provided in a center between the hours of one a.m. and six a.m., inclusively.

"Parent" means the biological or adoptive parent(s) or legal guardian(s) of a child enrolled or in the process of being enrolled in a child care center.

"Physician" means an individual licensed to practice medicine in any of the 50 states or the District of Columbia.

"Program director" means the person responsible for programmatic functions and supervision of all staff who work directly with children.

"Sponsor" means an individual, partnership, association, or corporation responsible for the operation of a child care center subject to licensure.

"Staff or center staff" means administrative, program, service, and volunteer personnel including the licensee when the licensee is an individual.

"Volunteer personnel" means persons who work at the center once a week or more often or who are counted in the required ratio of staff to children.

## Article 2   Legal Base

§ 1.2

Section 63.1–195 et seq. of the Code of Virginia describes the responsibility of the Department of Social Services for the regulation of residential and day care programs for children, including child care centers.

§ 1.3

Section 63.1–202 of the Code of Virginia requires the State Board of Social Services to prescribe standards for certain activities, services, and facilities for children, including child care centers.

## Article 3   Purpose

§ 1.4

The purpose of these Minimum Standards for Licensed Child Care Centers is to protect children who are separated from their parents or guardians during a part of the day by:

1. ensuring that the activities, services, and facilities of child care centers are conducive to the well-being of children; and

2. reducing risks in the caregiving environment.

## Article 4   Applicability

§ 1.5

These Minimum Standards for Licensed Child Care Centers apply to a private home wherein group care is provided to ten or more children and to any place other than a private family home wherein group care is provided to any number of . children.

§ 1.6

Section 63.1–195 of the Code of Virginia defines a child care center subject to licensure as "any facility operated for the purpose of providing care, protection, and guidance to a group of children separated from their parents or guardian during a part of the day only."

EXCEPTIONS: (as set forth under the definition of "child care center" in § 63.1–195 of the Code of Virginia.)

1. "A facility required to be licensed by the Health Department as a summer camp";
2. "A public or private school unless the Commissioner determines that such private school is operating a child care center outside the scope of regular classes";
3. "A school operated primarily for the educational instruction of children from two to five years of age at which children two through four years of age do not attend in excess of four hours per day, and children five years of age do not attend in excess of six and one-half hours per day";
4. "A facility operated by a hospital on the hospital's premises, which provides care to the children of the hospital's employees, while such employees are engaged in performing work for the hospital";
5. "A Sunday school conducted by a religious institution or a facility operated by a religious organization where children are cared for during short periods of time while persons responsible for such children are attending religious services";
6. Exception as set out in Section 63.1–196 of the Code of Virginia: A facility operated by an agent of the Commonwealth, county, town, or city, acting within the scope of his authority as such;
7. Exception as set out in § 63.1–196.3 of the Code of Virginia: A child care center operated or conducted under the auspices of a religious institution may be exempted from licensure by filing specified information with the department. (Such a child care center is not statutorily prohibited from applying for a license from the department.)

## PART II  ADMINISTRATION
### Article 1  Sponsorship

§ 2.1

Each center shall have a clearly identified sponsor.

§ 2.2

Sponsorship

A. When the center is sponsored by an individual proprietorship, the individual shall be the licensee.
B. When the center is sponsored by a partnership, the partnership shall serve as the licensee and develop a written agreement (articles of partnership) which allows operation and maintenance of a child care center.
C. When the center is sponsored by an unincorporated association, the association shall have a governing board which serves as the licensee and have a written set of by-laws and/or a written constitution which allows the operation and maintenance of a child care center.
D. When the center is sponsored by a corporation, the corporation shall have a governing board which serves as the licensee and have a charter or certificate of authority to transact business in the Commonwealth of Virginia, which allows operation and maintenance of a child care center.

§ 2.3

The sponsor, represented by the individual proprietor or by the officers and agents of a partnership, association, or corporation, shall be of good character and reputation; and shall not have been convicted of a felony or a misdemeanor related to abuse, neglect, or exploitation of children or adults.

§ 2.4

Posting of the License (§ 63.1–196(c) of the Code of Virginia)

The license shall be posted in a place conspicuous to the public, near the main entrance of the building(s), or the main office.

## § 2.5

### Deceptive Representation or Advertisement (§ 63.1–196(d) of the Code of Virginia)

No child care center "shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made ... an advertisement of any sort regarding services or anything so offered to the public, which ... contains any promise, assertion, representation, or statement of fact which is untrue, deceptive, or misleading."

### Article 2 Operational Responsibilities

## § 2.6

The operational responsibilities of the licensee shall include, but not be limited to, the following:

1. to develop prior to acceptance of children a written statement of the purpose and scope of the services to be provided by the center and written policies under which the center will operate (Note: This requirement applies only to initial applications for licensure unless there is a significant change);

2. to ensure that the center's activities, services, and facilities are maintained in compliance with the Minimum Standards for Licensed Child Care Centers; with the terms of the current license issued by the department; with other relevant federal, state, or local laws and regulations; and with the center's own policies which are required by these standards;

3. to appoint and identify in writing an administrator to be responsible for the day-to-day operation and management of the center, except when the sponsor is an individual who serves as the administrator or a partnership in which a partner serves as the administrator.

### Article 3 Financial Responsibilities

## § 2.7

Section 63.1–198 of the Code of Virginia: With an initial application for licensure, the applicant shall provide the department with the following evidence of financial responsibility:

1. a projected budget detailing expected income and expenses of the proposed center for the first year of operation; and

2. a complete balance sheet showing separately the current assets committed to, and current liabilities charged against, the proposed center.

   Note: Financial records may be requested pursuant to § 63.1–210 of the Code of Virginia.

## § 2.8

The center shall maintain public liability insurance for bodily injury with a minimum limit of at least $500,000 each occurrence/$500,000 aggregate. Evidence of insurance coverage shall be made available to the department's representative upon request.

## § 2.9

A plan of accident and/or school insurance shall be available to the parent. The center may designate whether the parent's participation in the plan is optional or mandatory.

### Article 4 Record Keeping Responsibilities

## § 2.10

The licensee shall ensure that the center maintains a system of record keeping which complies with these standards.

## § 2.11

All children's records shall be treated confidentially.

EXCEPTION: Records shall be made available to the custodial parent or legal guardian upon request.

## § 2.12

Records shall be kept current.

## § 2.13

All records required by these standards for both children and personnel shall be retained at the center for one year after termination of enrollment or termination of employment, respectively, unless specified otherwise.

## PART III  PERSONNEL

### Article 1  General Qualifications

§ 3.1

The following standards shall apply to all staff:

1. No staff shall have been convicted of a felony or a misdemeanor related to abuse, neglect, or exploitation of children or adults.
2. All staff shall understand and be sensitive to the varying capabilities, interests, needs, and problems of children in care.
3. All staff shall be:
   a. of good character and reputation;
   b. capable of carrying out assigned responsibilities;
   c. willing and able to accept training and supervision;
   d. able to communicate effectively both orally and in writing as applicable to the job responsibility; and
   e. able to understand and apply those standards in the Minimum Standards for Licensed Child Care Centers which relate to their respective responsibilities.

§ 3.2

All staff who work directly with children shall have the abilities to:

1. communicate effectively and appropriately with the age group to whom the staff person is assigned;
2. provide a stimulating and safe environment for the age group to whom the staff person is assigned; and
3. use materials, activities, and experiences to encourage exploring, experimenting, and questioning.

§ 3.3

All staff who work in multiple positions within the center shall meet the qualifications of each position.

Note: Personnel titles used in the standards are descriptors only. Centers are not required to use the same titles.

§ 3.4

All staff who work directly with children shall be 18 years of age or over.

EXCEPTION: Aides may be under 18 but must be at least 14 years of age.

### Article 2  Personnel Records

§ 3.5

Personnel records shall be kept for paid staff and volunteer personnel who begin work subsequent to April 1, 1986.

§ 3.6

Personnel records shall include the following:

1. the original application for employment or other written material providing:
   a. identifying information including name of staff person, beginning date of employment/volunteering, and job title;
   b. information needed to demonstrate that the individual possesses the qualifications contained in §§ 3.1 and 3.2 such as, but not limited to, interviews; observations; references; experience; and education related to the position; description of previous employment;
2. written documentation that references as to character and reputation as well as competency were checked with previous employers, if any, and/or other knowledgeable and objective sources prior to employment or volunteering (e.g., letters of reference; notations of telephone reference checks including the name of the person(s) contacted, the date(s) of contact, the firm(s) contacted, and the results);
3. documentation of dates and participation in orientation, training, and staff development activities; and
4. date of termination, when applicable.

### Article 3  Health Requirements

§ 3.7

Health information required by these standards shall be maintained for all staff (including the licensee, the administrator, and volunteer personnel) who come in contact with children or who handle food.

A. Initial Tuberculosis Examination and Report

1. Within 30 days before or 30 days after employment or contact with children,

each staff person shall obtain an evaluation indicating the absence of tuberculosis in a communicable form.

EXCEPTION: When a staff person terminates work at one licensed facility and begins work at another licensed facility with a gap in service of six months or less, the previous statement of tuberculosis screening may be transferred to the second facility.

2. Each staff person shall submit a statement that he is free of tuberculosis in a communicable form. This statement shall include the following:

   a. the type(s) of test(s) used and the test result(s),

   b. the date of the statement, and

   c. the signature of the physician, the physician's designee, or an official of a local health department.

B. Subsequent Evaluations

   Any staff person who comes in contact with a known case of tuberculosis or who develops chronic respiratory symptoms shall within one month after exposure/development receive an evaluation in accordance with subsection A of ·§ 3.7.

§ 3.8

At the request of the licensee/administrator of the facility or the Department of Social Services, a report of examination by a physician shall be obtained when there are indications that the safety of children in care may be jeopardized by the physical or mental health of a specific staff person.

§ 3.9

Any staff person who, upon examination or as a result of tests, shows indication of a physical or mental condition which may jeopardize the safety of children in care or which would prevent performance of duties:

1. shall be removed immediately from contact with children or food served to children and

2. shall not be allowed contact with children or food served to children until the condition is cleared to the satisfaction of the examining physician as evidenced by a signed, dated statement from the physician.

### Article 4   Staff Training

§ 3.10

Prior to assuming job responsibility all staff shall receive training in:

1. their individual responsibilities in the event of fire, including the location and operation of any fire extinguishers and fire alarm boxes;

2. their individual responsibilities in the event of a child's illness or injury, including the location and use of the first aid kit.

§ 3.11

Orientation

Staff who work with children shall receive training in the following topics no later than one week after starting employment or volunteer work:

1. the purpose and services provided by the center;

2. the policies and procedures of the center as these relate to the staff person's responsibilities;

3. procedures for reporting suspected child abuse or neglect to the appropriate local department of social services (Note: § 63.1–248.3 of the Code of Virginia requires any person providing full or part-time child care for pay on a regularly planned basis to report suspected child abuse or neglect.);

4. confidential treatment of personal information about children in care and their families;

5. the Minimum Standards for Licensed Child Care Centers as related to the staff person's responsibilities.

§ 3.12

Staff Development

A. On an annual basis employed staff who work directly with children shall attend at least eight hours of staff development activities which shall consist of in-service training programs, workshops, or conferences closely related to group care of children.

B. There shall be at least one staff person on duty at all times who has obtained

instruction in performing the daily health observation of children from a physician, registered nurse, or health department medical personnel. This instruction shall be obtained at three year intervals.

EXCEPTION: At least one staff person must receive this instruction prior to the initial opening of a center. Within six months of initial licensure, the new center shall comply fully with subsection B of § 3.12.

### Article 5  Administrative Staff

§ 3.13

During the center's hours of operation, one adult on the premises shall be in charge of the administration of the center. This person shall be either the administrator or an adult appointed by the licensee or designated by the administrator.

### Article 6  Program Staff

§ 3.14

Each person serving in the positions of program director, assistant program director, or child care supervisor shall not be responsible for the individual supervision of more than two aides.

§ 3.15

Program Director and Assistant Program Director

A. Responsibilities

There shall be one person responsible for the center's program which shall include, but not be limited to, the following areas:

1. the content of the program offered to the children in care;

2. programmatic functions, including orientation, training, and scheduling of all staff who directly supervise children, whether or not the program director personally performs these functions; and

3. management of the supervision provided to all staff who directly supervise children, whether or not the program director individually supervises such staff.

B. Qualifications

1. All program Directors hired or promoted after April 1, 1986 shall meet one of the following sets of qualifications:

   a. forty-eight semester hours or 72 quarter hours of college credits of which 12 semester hours or 18 quarter hours are in Early Childhood Education, Child Development, or other subjects relating to group care of children, and one year of programmatic experience in a child care center or nursery school; OR

   b. forty-eight semester hours or 72 quarter hours of college credits and two years of programmatic experience in a child care center or nursery school.

   c. Allowable substitutions

   (1) A maximum of nine Continuing Education Units (C.E.U.'s) will be accepted in lieu of six semester hours or nine quarter hours of college credits.

   (2) The Child Development Associate Credential (C.D.A.) may be substituted for 12 semester hours or 18 quarter hours of college credits or the C.D.A. may be substituted for the required courses.

   d. Verification of qualifications shall be available to the Commissioner's representative upon request.

C. If the program director is present in the center less than four hours per day, there shall be an officially designated assistant program director who shall assume responsibility in the absence of the program director. In this situation, the assistant program director shall meet the qualifications described in paragraph one of subsection B of § 3.15.

§ 3.16

Child Care Supervisor

Individuals working in this capacity are responsible for program implementation and direct supervision of children. Child care supervisors hired or promoted after April 1, 1986 shall have one of the following qualifications:

1. C.D.A. (Child Development Associate Credential); or

2. high school diploma or G.E.D. and one year of programmatic experience in group care for children; or

3. three years programmatic experience in a child care center or nursery school.

§ 3.17

Aides

A. Aides may be under 18 but must be at least 14 years of age.

B. Individuals working in this capacity are assigned to assist the child care supervisor in program implementation and supervision of children.

C. An aide who is under the age of 16 years may work with a group of children only under the direct individual supervision and in the presence of a staff member who meets the qualifications of the program director or child care supervisor. An aide under the age of 16 shall not be left in charge of a group of children.

### Article 7 Volunteers and Volunteer Personnel

Note: Volunteers are persons who come to the center less than once a week and are not counted toward the required number of staff. Volunteer personnel are persons who come to the center once a week or more often or who are counted toward the required number of staff in §§ 4.1, 4.2, or 4.7. Volunteer personnel shall meet the personnel and health requirements for the applicable position.

§ 3.18

All volunteers and volunteer personnel shall be under the individual supervision of an individual who meets the qualifications of a program director, or child care supervisor.

§ 3.19

The duties of volunteers shall be clearly defined.

## PART IV SUPERVISION

### Article 1 General Supervision

§ 4.1

There shall be at least two staff at the center and on field trips at all times when one or more children are present. One of these shall meet the qualifications of the program director or child care supervisor.

§ 4.2

When the outdoor activity area is not adjacent to the center, there shall be at least two staff on the outdoor activity area whenever one or more children are present.

§ 4.3

A child shall be greeted upon arrival at the center each day by a staff person. If possible, the same staff person shall greet the child each day.

§ 4.4

A written record of children in attendance each day shall be maintained at the center.

§ 4.5

Children shall be supervised (i.e., within sight and sound) at all times, except that staff need only be able to hear a child who is using the bathroom. Staff shall check on a child who has not returned from the bathroom after five minutes.

### Article 2 Staff to Children Ratio Requirements

§ 4.6

Staff shall be counted in the required staff to children ratios only for periods of time when they are directly supervising children.

EXCEPTION: Aides who are under the age of 16 years shall not be counted in determining the required ratios of staff to children.

§ 4.7

The following ratios of staff to children are required whenever children are on the premises of the center, or on the outdoor activity area, and during all field trips provided by the center:

1. for children from birth to the age of 16 months: one staff person for every four children;

2. for children 16 months old to two years: one staff person for every five children;

3. for children from two years to four years: one staff person for every ten children;

4. for children from four years to the age of eligibility to attend public school: one staff person for every 12 children;

5. for children from the age of eligibility to attend public school and older: one staff person for every 20 children.

§ 4.8

When children are regularly in ongoing mixed age groups, the staff to children ration applicable to the youngest child in the group shall apply to the entire group.

Note: For children over the age of two, the transition period up to one hour after opening and one hour before closing is not considered a regular and ongoing mixed age group period. A ratio of one staff person to every 24 children with each pre-school age child counting as two children shall apply during the transition period.

Article 3   Ratio During Rest Periods

§ 4.9

During designated rest or sleeping periods for preschool age children, the ratio of staff to children is permitted to be double the number of children to each staff required in subsection 3 and 4 of § 4.7 provided that:

1. a staff person is within the room and within sight and sound of the resting/sleeping children;

2. all staff counted in the overall naptime ratio shall be within the center and available to assure safe evacuation in an emergency; and

3. an additional person is present at the center to assist, if necessary.

EXCEPTION: In a mixed age group of preschoolers, double the number of children to each staff applicable to the youngest child shall apply.

Article 4   Supervision of Children During Swimming & Wading Activities

§ 4.10

The staff ratios required by Article 2 shall be maintained while children are using the swimming and wading pools.

§ 4.11

If a pool exceeds two feet of water in depth, a Water Safety Instructor or Senior Life Saver holding a current certificate by an organization such as, but not limited to, the Red Cross shall be on duty supervising the children at the pool at all times when one or more children are in the pool.

§ 4.12

A minimum of two people employed by the center must be on duty supervising the children at the pool at all times when one or more children are in the pool.

PART V   PHYSICAL ENVIRONMENT

A center must provide an environment which protects the children from physical harm but is not so restrictive as to inhibit physical, intellectual, emotional, or social development.

Article 1   Safety, Health, and Comfort

§ 5.1

No child care center shall be located where conditions exist that would be hazardous to the physical health and safety of children.

§ 5.2

All equipment and areas inside and outside the center including the grounds shall be well maintained, in safe condition, and free from safety hazards.

§ 5.3

Building Construction and Maintenance

A. If space used or planned for use by the center is renovated or altered, the plans shall be submitted to the Department for review prior to the expected change.

B. Prior to beginning operation and prior to use of newly constructed, renovated, remodeled, or altered buildings or sections of buildings, written documentation of the following shall be provided:

1. inspection and approval of the building(s) from the local building official or the Office of the State Fire Marshal, whichever is applicable, or approval of a plan of correction;

2. inspection and approval from the local Health Department, or approval of a plan of correction, for meeting:
   a. sanitation and health;
   b. water supply;
   c. sewerage system;
   d. food service.

3. inspection and approval from the local fire department that the center is free from fire hazards or approval of a plan of correction; and

4. inspection and approval from the administrator of local child care ordinances, or approval of a plan of correction.

C. At the time of a renewal application, written documentation of annual approval, or approval of a plan of correction, shall be provided from:

1. the Office of the State Fire Marshal, if applicable;

2. the local health department;

3. the local fire department; and

4. the local administrator of any applicable child care ordinance.

## § 5.4

### Grounds

A. There shall be a safe area for arrival and departure of children.

EXCEPTION: Centers licensed prior to April 1, 1986, which are unable to provide this safe area shall provide parents with procedures for protecting children from traffic and other hazards during arrival and departure.

B. There shall be outside lighting at entrances and exits used by children to protect against injuries when the center operates before sunrise or after sundown.

C. Outside sand in self-contained boxes with bottoms which prevent drainage shall be covered when not in use.

## § 5.5

### Sanitation

A. Cleanliness of the facility and all of its furnishings and equipment shall be maintained.

B. The facility shall be free from insects, rodents, and other pests.

C. Drinking water shall be available at all times.

D. Drinking fountains, if used, shall be of a type approved by the local health department.

E. Individual disposable cups shall be provided for drinking water when fountains are not used.

F. All disposable products shall be used once and discarded.

G. Personal Articles

If combs, toothbrushes, wash cloths, or cloth towels are used, they shall be individually assigned.

## § 5.6

### Lighting

Areas used by children shall be adequately lighted for safety and for the activity taking place.

## § 5.7

### Temperature and Ventilation

A. Areas used by children shall be well ventilated and dry.

B. Except for windows or doors used for fire exits, screens shall cover any windows or doors opened for ventilation.

EXCEPTION: For centers licensed prior to April 1, 1986, this requirement does not apply to jalousied windows which open into and out of the window frame at such a depth that they cannot be screened.

C. Fans shall be placed at a height out of the reach of children or shall be placed in a room to which children do not have access.

D. The center shall use a portable thermometer for measuring temperature in areas used by children.

E. In areas used by children, temperature shall be maintained no lower than 68 degrees Fahrenheit.

F. In centers or areas of centers serving infants, toddlers, or preschoolers, the temperature maintained shall be based on a measurement at one to two feet from the floor.

§ 5.8

Equipment and Materials

A. Equipment and play materials shall be durable and free from characteristics that may be hazardous or injurious to children such as, but not limited to, sharp, rough edges; toxic paint; and objects small enough to be swallowed.

B. Steps used by the children and consisting of three or more risers shall be equipped with handrails within the normal handgrasp of the children or a banister with vertical posts, between the handrail and each step, which can be safely grasped by the children.

C. Windows, exterior doors, stairways, walkways, and openings, such as cellars and window wells, or other potential sources of injury or harm to children shall be equipped with safeguards such as, but not limited to, screens, gates, and/or handrails.

D. All electrical outlets in areas used by children shall have protective caps or other equivalent, protective devices approved by an electrical safety authority recognized by the Department.

E. Cleaning fluids and other harmful household agents

1. Such substances shall be stored in containers that clearly indicate their contents.

2. If such substances are not kept in original containers, the substitute containers shall not resemble food or beverage containers.

3. Such substances shall be kept in a locked place using a safe locking method that cannot be unlocked by children.

4. If a key is used, the key shall be placed out of the reach of children.

Article 2   Space, Furnishings,
Equipment, and Materials

§ 5.9

Group Activity Areas

A. Calculation of Activity Space

1. Centers shall have a minimum of 25 square feet of available activity space per child and 200 cubic feet of air space per child. Space in areas used by infants and toddlers shall be calculated separately from space for older children.

Note: Activity space includes equipment used during activities.

2. Areas not routinely used for children's activities shall not be calculated as available activity space. Space not calculated shall include, but not be limited to, offices; hallways; bathrooms; kitchens; storage rooms/closets; and space occupied by cribs, changing tables, or equipment which is not used in or does not contribute to the children's activities.

B. Centers shall have equipment and materials which are suitable and appropriate to the developmental stages of the children, in sufficient supply, and accessible to children for activities required by these standards.

C. Areas shall be provided where equipment and materials can be readily used by children during active play periods.

D. When playing on the floor, children at each developmental stage shall be protected from children at more advanced developmental stages.

E. Tables and chairs in a quiet area shall be available for school age children who wish to study.

F. An activity area shall be available for school age children which is separate from that assigned for the use of younger children.

G. Outdoor Activity Space

1. Centers shall use a clean, safe outdoor activity area, either adjoining or accessible to the center, which shall provide a minimum of 75 square feet of space per child on the outdoor area at any one time.

2. The outdoor activity area for children shall include an unpaved space such as, but not limited to, grass or indoor/outdoor carpet.

3. Sufficient, suitable, age-appropriate outdoor play equipment shall be provided for children using the outdoor activity area and shall be safely maintained.

H. Swimming and Wading Pools

1. When permanent swimming or wading pools are located on the prem-

ises of the center the following standards shall apply:

    a. All pools constructed, renovated, or remodeled after July, 1976 shall have a statement of their inspection and approval from the State Health Department and the local administrator.

    b. All pools constructed, renovated, or remodeled after April 1, 1986 shall have a statement in writing of their inspection and approval from the local building official.

    c. Outdoor swimming pools shall be enclosed by safety fences and gates which shall be kept locked when the pool is not in use.

    d. Entrances to indoor swimming pools shall be locked when the pool is not in use.

    e. Written safety rules shall be posted at the pool.

2. When swimming or wading is provided as a part of the center program in either on-site or off-site pools, the following standards apply:

    a. The center shall maintain written, signed permission from the parent of each child who participates in swimming or wading.

    b. The center shall distribute written safety rules to center staff and to parents of participating children.

    c. If portable wading pools are used, they shall be emptied of dirty water and filled with clean water for each day's use, and more frequently if necessary.

## § 5.10

### Areas for Sleep and Rest

A. No more than one child at a time shall use a crib, cot, mat, or bed.

B. A separate crib, cot, bed, or mat, according to the age of the child, shall be assigned to each child who is regularly in attendance at naptime or bedtime.

C. Cribs, cots, mats, and beds shall be marked or identified in some way for use by a specific child.

D. Double decker cribs, cots, or beds shall not be used.

E. Children under the age of 24 months shall be provided separate sleeping areas from those children 24 months and over.

F. Cribs

    1. Cribs must be used for children under 12 months of age and for children over 12 months of age who are not developmentally ready to sleep on a cot.

    2. Crib sides shall always be up and the fastenings secured when a child is in the crib, except when staff is giving the child immediate attention.

    3. When cribs with slats are used by the center, there shall be no more than six centimeters or 2⅜ inches of space between slats.

G. Mats may be used by school age children only.

    1. Mats shall be at least 22 inches wide and 39 inches long and shall be covered with a waterproof material that is readily cleanable, such as vinyl.

    2. Mats shall be at least one inch thick.

H. Evening and Overnight

    1. For evening care, beds with mattresses or cots with at least a one inch foam rubber pad shall be provided for children not required to sleep in cribs.

    2. For overnight care, beds with mattresses or cots with at least a two inch foam rubber pad shall be required for children not required to sleep in cribs.

    3. For overnight care which occurs for a child on a regular and ongoing basis, beds with mattresses shall be required.

    4. For evening and overnight care, separate sleeping areas shall be provided for children of the opposite sex 10 years of age and older.

    5. When sleeping garments are used, they shall be clean, comfortable, and plainly marked for individual use.

I. Required Bed Linens

    1. Required bed linens for cribs, cots, mats, or beds shall consist of a top cover and a bottom cover or a one-piece covering which is open on three edges.

▌▌▌▌▌▌▌

2. Mattresses when used shall be covered with a waterproof material which can be easily sanitized such as, but not limited to, vinyl or a nonfilm type polyethylene material.

J. Pillows

1. When used, pillows shall be assigned for individual use and covered with pillow cases.

2. Pillows shall not be used by children under two years of age.

K. Arrangement of Cribs, Cots, Mats, and Beds

1. When one or more children are scheduled to enter or leave the center while other children are resting or sleeping, the cribs, cots, mats, or beds shall be placed so that the resting or sleeping children are not disturbed by the arriving or departing children.

2. Occupied cribs, cots, mats, and beds shall be at least 2½ feet from radiators in use.

3. There shall be at least 30 inches of space between service sides of occupied cribs and other furniture when that space is the walkway for staff to gain access to any child in any crib.

4. There shall be at least 12 inches of space between the sides and ends of occupied cribs except where they touch the wall.

5. Cots, beds, or mats shall be placed so that children can get on and off their cots, beds, or mats without being hampered in their movement.

   a. There shall be at least 15 inches of space between sides and ends of occupied cots, beds, and mats.

   b. Fifteen inches of space are not required where cots, beds, or mats touch the wall or where screens are placed between cots or beds as long as one side is open at all times to allow for passage.

§ 5.11

Quiet, Private Area

There shall be a separate area for children who are ill, injured, or emotionally upset.

§ 5.12

Bathroom Facilities

A. Bathroom areas shall be equipped with sinks with heated and cold running water, soap, paper towels, toilets, and toilet paper.

B. All toilets counted for children shall be the standard flush type, accessible, and within the same building as the children.

C. Urinals may be substituted for not more than one-half the required number of toilets, provided the center has at least two toilets.

D. An adult size toilet with privacy shall be provided for staff use. The staff toilet may be counted in the number of required toilets for children only if children are permitted unrestricted access to them on a routine basis.

E. When child size toilets, urinals, and low sinks are not available in bathrooms used by preschool children, at least one platform or set of steps will be available so that preschool children may use adult size toilets and sinks without assistance or undue delay.

F. In overnight care, an operational tub or shower shall be provided for children over 24 months to bathe.

G. Required Number of Toilets and Sinks

1. The center shall have one toilet and one sink for every 15 preschool children and one toilet and one sink for every 30 school age children.

2. In centers or portions of centers licensed for school age children, at least one toilet shall be individually enclosed for privacy in any bathroom which contains more than one toilet.

3. For centers licensed for 30 or fewer school age children, only school age children of the same sex may occupy the bathrooms at the same time.

4. For centers licensed for more than 30 school age children, separate bathrooms shall be provided for school age children of the opposite sex.

H. Diapering and Toilet Training Areas

1. In centers serving children who are not completely toilet trained, there shall be a diapering center in each area or immediately accessible to each area

designated for children not toilet trained. To be considered immediately accessible, the diapering center must be located in a room which opens directly into the area for children. The diapering center shall contain:

a. a sink with heated and cold running water and a nonabsorbent changing surface;

b. a step-on diaper pail with leak-proof disposable liners or equivalent equipment which does not require the top of the pail to be touched by hand when discarding diapers. If both cloth and disposable diapers are used, there shall be one such pail for each type; and

c. a covered receptacle for soiled bed linens and nondisposable wash cloths.

2. For every 10 children in the process of being toilet trained there shall be one toilet chair, OR one child-sized toilet, OR one adult sized toilet with a platform or steps and an available adapter seat. These items shall either be located in the area used for the majority of the day by the children being toilet trained OR the immediately accessible area (see § 5.10.H.1).

3. When only toilet chairs are used, there shall be a toilet located in an area or room in which the door is not more than 10 feet from the area used for the majority of the day by the children being toilet trained.

§ 5.13

Food Service Areas

A. Eating utensils and dishes shall be appropriate to the sizes, developmental stages, and physical dexterity of the children served.

B. Disposable dishes and utensils shall be sturdy enough to contain food without leakage and to prevent harm and injury to children.

C. High chairs, infant carrier seats, or feeding tables shall be used for children under 12 months who are not held while being fed.

D. Sturdy chairs and tables appropriate to the sizes of the children shall be used at mealtime.

§ 5.14

Storage

A. There shall be individual storage space such as, but not limited to, lockers or cubbies for each child's clothing and personal items.

B. There shall be storage space accessible to the children for equipment and materials used by them.

## PART VI   PROGRAMS AND SERVICES

### Article 1   Admission Policies and Procedures

§ 6.1

Identifying Information for Each Child

A. Each center shall maintain and keep at the center a separate record for each child.

B. Each child's record shall contain the following identifying information:

1. name, nickname (if any), sex, and birthdate of the child;

2. name, home address, and home telephone number of each parent who has custody;

3. work telephone number and place of employment of each parent who has custody;

4. name and telephone number of child's physician;

5. name, address, and telephone number of a designated person to call in an emergency if a parent cannot be reached;

6. names of persons authorized to pick up the child as well as those not permitted to pick up the child;

7. admission date;

8. enrollment termination date;

9. the child's grade level and the name of his school, where applicable.

C. Children under 12 months of age shall have their name identified on some item attached to their person or their clothing. Necklaces and pins shall not be used.

## § 6.2

### Agreements/Authorizations

A. A written agreement between the parent and the center shall be in each child's record at the time of the child's admission. The agreement shall include:

1. an authorization for emergency medical care if an emergency occurs when the parent cannot be located immediately;

2. a statement that the center will notify the parent when the child becomes ill and that the parent will arrange to have the child picked up as soon as possible.

B. Written permission from the parent authorizing the child's participation in center field trips shall be in the child's record.

C. One of the following two methods of obtaining permission for field trip participation shall be used:

1. Separate written permission shall be secured for each field trip.

### OR

2. Written permission for all center field trips that occur while the child is enrolled in the center shall be secured. In addition, the parent must be informed in advance of each planned field trip and be given the opportunity to withdraw his child(ren) from a field trip.

D. If a parent wishes a child to leave the center unaccompanied, written permission from the parent authorizing the child to leave the center shall be secured.

E. The center shall not release a child to any person without the parent's consent.

## § 6.3

### Assessment and Initial Plan of Care

A. Prior to the child's admission there shall be a personal interview at the center with a staff person, the parent,' and the child unless there are unusual circumstances which preclude having the child present for the initial interview.

Note: The purpose of the interview is to provide the opportunity for the parent and staff to exchange information and arrive at a joint decision about the admission of the child.

B. Prior to the child's admission, the center shall inform the parent of:

1. fees and tuition, and

2. the program and activities provided.

C. Prior to the child's admission, the center shall provide written information to the parent regarding the following:

1. admission and enrollment termination policies, including the amount of notice required from the parent and the center prior to termination of enrollment.

2. hours and days of operation, including holidays and other closures;

3. the center's definition of acceptable and unacceptable discipline methods;

4. transportation safety policies, when transportation is provided;

5. food policies.

## § 6.4

### Physical Examinations/Immunizations

A. Timing and Frequency of Medical Reports

1. Immunizations

Section 22.1–271.2 of the Code of Virginia requires that documentation of all immunizations received be obtained prior to each child's admission to a child care center required to be licensed by this Commonwealth.

EXCEPTION (§ 22.1–271.2C) of the Code of Virginia: Documentation of immunizations is not required for any child whose parent submits an affidavit to the center, on the form entitled "Certificate of Religious Exemption", stating that the administration of immunizing agents conflicts with the parent's or child's religious tenets or practices.

2. Physical Examination

Each child shall have a physical examination by or under the direction of a physician, prior to admission or within one month after admission. The schedules for examinations prior to admission for different age groups are listed below:

a. within two months prior to admission for children six months of age and younger;

b. within three months prior to admission for children aged seven months through 18 months;

c. within six months prior to admission for children aged 19 months through 24 months;

d. within 12 months prior to admission for children two years of age through five years of age;

e. within two years prior to admission for children six years of age and above.

EXCEPTIONS:

(1) Children transferring from a facility licensed by the Virginia Department of Social Services, certified by a local department of public welfare/social services, or approved by a licensed Family Day Care System:

If the initial report or a copy of the initial report of immunizations is available to the admitting facility, no additional examination is required. If the initial report or a copy of the initial report is not available, a report of physical examination and immunizations is required in accordance with subsections A and B of § 6.4.

(2) (§ 22.1–270 D of the Code of Virginia): Physical examinations are not required for any child whose parent objects on religious grounds. The parent must submit a signed statement noting that the parent objects on religious grounds and certifying that to the best of the parent's knowledge the child is in good health and free from communicable or contagious disease.

B. Form and Content of Medical Reports
1. The current form required by the Virginia Department of Health shall be used to report immunizations received and the results of the required physical examination.

EXCEPTION: When the current Health Department form has not been used such as, but not limited to, when a child transfers from another state, other documentary proof of the child having received the required examination and immunizations shall be accepted. Documentary proof may include, but not be limited to, an International Certificate of Immunization, another state's immunization form, or a physician's letterhead.

2. Each report shall include the date of the physical examination and dates immunizations were received.

3. Each report shall be signed by a physician, his designee, or an official of a local health department.

4. Each report shall be filed at the center during the child's enrollment.

Article 2   Health Care

§ 6.5

Medical Reports after Admission

A. Updated information on immunizations received shall be obtained once every six months for children under the age of two years.

B. Updated information on immunizations received shall be obtained once between each child's fourth and fifth birthdays.

C. These medical reports shall meet the form and content requirements under subsection B of § 6.4.

§ 6.6

Medication

A. Prescription and nonprescription medication shall be given to a child only with written authorization from the parent.

B. The authorization for administering any medication shall be effective for a limited time period not to exceed ten work days, unless otherwise prescribed by a physician, and shall be retained on file at the center during the effective period.

C. All medication shall be labeled with the child's name, the name of the medication, the dosage amount, and the time(s) to be administered.

D. Prescription medication shall be in the original container with the prescription label affixed.

E. All medication shall be kept in a designated locked place or a refrigerator inaccessible to children.

F. Prescription and nonprescription medication shall be returned to the parent as soon as the medication is no longer being administered.

§ 6.7

Special Care Provisions to Prevent the Spread of Disease

A. Staff with training as required in subsection B of § 3.12 shall observe each child daily for signs and symptoms of illness.

B. If a child has signs or symptoms of a communicable disease or has a diagnosed communicable disease, arrangements shall be made for the child to leave the center as soon as possible after the signs or symptoms are noticed.

C. A child showing signs or symptoms of a communicable disease shall remain in the designated quiet, private area until leaving the center.

D. When a child has been exposed to a communicable disease while attending the center, the parent shall be notified at the end of the day.

E. The current edition of the Communicable Disease Chart, available from the State Department of Health or Department of Social Services, shall be posted in the center.

F. The current Communicable Disease Chart recommendations for the exclusion of sick children from the center shall be followed. (Refer to Communicable Disease Chart in Appendix.)

G. If a child's clothing becomes wet or soiled, it shall be changed immediately.

H. Children's hands shall be washed with soap and warm water prior to eating meals or snacks and after toileting.

I. Staff Procedures for Diapering and Toileting

1. Diapers shall be changed on a nonabsorbent changing surface which shall be washed with soap and warm water after each use. A disposable paper sheet which is discarded after each diapering may be used in lieu of washing the nonabsorbent changing surface after each use.

2. A child's diapers shall not be changed in a crib.

3. The child's genital area shall be thoroughly cleaned during each diapering.

4. Staff shall wash their hands with soap and warm water after each diaper change and after helping a child with toileting.

5. Cloth wash cloths used in diaper changes shall be used once and laundered before being used again.

6. Toilet chairs shall be emptied promptly after each use.

J. Laundering of Bed Linens

1. Crib sheets for children under 12 months of age shall be changed at least once a day and whenever soiled.

2. Bed linens for children 12 months of age and older shall be changed at least once per week and whenever soiled.

3. Bed linens shall be assigned for a child's individual use and shall be laundered before being used by another child.

4. Pillow cases shall be assigned for individual use. Pillow cases shall be laundered before being used by another child and changed at least weekly and whenever soiled.

Article 3 Communication with Parents

§ 6.8

There shall be regular, planned communication between the center and the parent about the progress, adjustment, and needs of the child.

§ 6.9

When a center decides to terminate the enrollment of a child, the center shall in-

form the parent of the reason(s) for termination.

§ 6.10

The center shall encourage parental involvement on a volunteer basis in any appropriate center activities.

§ 6.11

The center shall be open for parents to visit and observe their children at any time. (§ 63.1–210.1 of the Code of Virginia).

§ 6.12

Parents shall be informed of exceptional behavior which is unusual for the child or for the chronological age of the child.

§ 6.13

For each child under 18 months, the center shall post a daily record which can be easily seen by both the parent and by the staff working with the children. The record shall include the following information:

1. the amount of time the child slept;
2. the amount of food consumed and the time;
3. a description and the time of irregular bowel movements;
4. developmental milestones.

### Article 4 Management of Behavior

§ 6.14

Acceptable and unacceptable methods of discipline shall be defined in a written policy.

§ 6.15

Staff shall know and adhere to the center's policy on acceptable and unacceptable discipline methods.

§ 6.16

Expected behavior shall be on the child's developmental level.

§ 6.17

Limits or rules shall be appropriate and understandable to the children to whom they apply.

§ 6.18

Discipline shall be fair and consistently applied.

§ 6.19

Discipline shall be appropriate to the infraction and timely.

§ 6.20

There shall be no physical punishment or disciplinary action administered to the body such as, but not limited to, spanking; forcing a child to assume an uncomfortable position (e.g., standing on one foot, keeping arms raised above or horizontal to the body); restraining to restrict movement through binding or tying; enclosing in a confined space, box, or similar cubicle; or using exercise as punishment.

§ 6.21

Children shall not be shaken at any time.

§ 6.22

The center shall neither force nor withhold food, neither force nor withhold naps, nor punish toileting accidents in disciplining the child.

§ 6.23

Staff shall not be verbally abusive which would include, but not be limited to, threats or belittling remarks about any child or the family.

### Article 5 Nutrition and Food Services

§ 6.24

Meals and Snacks

A. Meals and snacks shall be provided by the center or catered, according to the following requirements:

1. Centers open morning through afternoon shall serve a morning snack, a midday meal, and an afternoon snack.
2. Centers open part of the day shall serve appropriate snacks and/or meals, based on their hours of operation; e.g., a center open only for after school care must serve an afternoon snack; a center open from seven a.m. to one p.m. must serve a morning snack and midday meal; a center offering evening or overnight care shall serve a snack.
3. Children who have not eaten an evening meal before they are admitted to the center for evening and/or overnight care shall be served one.
4. Children shall be served any meals or snacks scheduled for the period dur-

ing which they are present in the center.

5. There shall be a period of at least 1½ hours between each meal or snack service.

6. Meals and snacks shall meet the nutritional needs of children as established by a recognized authority such as the Child Care Food Program of the U.S. Department of Agriculture as listed in the charts found in Appendix II.

7. Meals and snacks shall provide opportunities for children to learn to eat and enjoy a variety of nutritious foods. Three sources of Vitamin A shall be served each week as listed in the chart found in Appendix III.

8. The Center shall not serve junk foods and empty calorie foods as part of a meal or required snack such as, but not limited to:

a. soda water and carbonated drinks, sweetened water-based beverages, tea, and coffee;

b. candies—hard sugar, fondants (i.e., caramels, chocolate, etc.), spun sugar;

c. gum;

d. caramel corn.

9. Potato chips, corn chips, cookies, and cake may be served only with a nutritionally balanced meal and may not be served alone as a required snack.

10. Menus

a. A menu listing all meals and snacks to be served by the center during the current one week period shall be dated and posted in a location conspicuous to parents or distributed to parents.

b. Posted menus shall indicate substitutions.

c. Menus shall be retained at the center for one month.

11. The center shall serve portions appropriate for the age, nutritional needs, and stages of development of the children. (Refer to USDA chart in Appendix)

12. Children shall be permitted to have additional servings.

B. The center may choose to permit parents to provide any of the following categories of food:

1. special diets for religious or medical reasons;

2. infant formulas;

3. baby food;

4. breakfasts;

5. snacks;

6. beverages and foods for celebrations and field trips;

7. mid-day meals for school age children only.

C. If the center chooses to permit parents to provide food, it shall provide parents with a copy of written policies and procedures which shall address:

1. when and under what conditions food may be brought from home;

2. procedures for stocking and supplying food from the center to a child whose food is lost or becomes inedible or is inadequate in nutrition or quantity;

3. procedures used by both parents and the center to protect against food contamination and spoilage; and

4. procedures used by both parents and the center to prevent children from eating food brought by other children, unless the food is intended to be shared, such as food brought for a celebration.

D. If the center permits parents to bring food from home, all unused portions shall be discarded or returned to parents at the end of each day.

§ 6.25

Special Food Service Needs

Special diets for individual children shall be provided by the center or brought from home.

§ 6.26

Infant and Toddler Food Service Needs

A. Infants shall be fed on demand unless parents provide other written instruction.

B. Prepared infant formula shall be refrigerated and clearly labeled with the child's first and last names.

C. Bottle fed infants who cannot hold their own bottles shall be picked up and held when fed. Bottles shall not be propped.

D. No child shall be allowed to drink from a bottle while lying down or while walking around.

E. Formula, bottled breast milk, and baby food not consumed by an infant may be used later in the same day, if dated and stored in the refrigerator; otherwise, it shall be discarded or returned to the parent at the end of the day.

F. The record of each child on formula shall contain:
1. the brand of formula;
2. the child's feeding schedule; and
3. a statement signed by the parent noting any type(s) of commercial formula which may not be used in an emergency.

G. A one-day's emergency supply of disposable bottles, nipples, and commercial formulas appropriate for the children in care shall be maintained at the center.

H. Upon request, mothers shall be allowed to breastfeed their infants at the center.

I. Staff shall feed semi-solid food with a spoon.

EXCEPTION: Infant feeders such as, but not limited to, the plunger type feeding device shall not be used except with written authorization and instructions from the child's physician.

J. Children shall be encouraged to feed themselves according to their developmental readiness.

K. Drinking water shall be offered at regular intervals to infants and toddlers.

L. Children using infant seats or high chairs shall be carefully supervised during snacks or meals. When a child is placed in an infant seat, the protective belt shall be fastened securely.

§ 6.27

Contract Food Services

A. If a catering service is used, it shall be approved by the local Health Department.

B. A copy of the current contract shall be made available to the Department's representative upon request.

Article 6 Resting

§ 6.28

The daily program for children shall provide experiences which promote growth, well-being, and the age-appropriate development of gross and fine motor skills; language skills; cognitive skills; social and emotional skills; positive self-concept, curiosity, interest, and exploration.

§ 6.29

There shall be a routine yet flexible schedule so that children have the security of knowing the sequence of daily activities.

A. The written schedule shall be available to parents upon request.

B. The daily schedule shall be retained for one month.

§ 6.30

Activities shall be geared to the ages and developmental levels of the children served.

§ 6.31

A mix of materials and activities both group and individual, active and quiet shall be provided.

§ 6.32

Outdoor activity shall be provided daily, weather permitting.

A. Centers operating five hours or more per day shall have at least one hour of outdoor activity per day which shall be divided between morning and afternoon.

B. Centers operating less than five hours per day shall have a brief outdoor recess in the morning or afternoon.
EXCEPTION: Outdoor activity may be omitted on days when an all day field trip will take place indoors, as in a visit to a museum.

§ 6.33

Infant and Toddler Activities

A. For infants and toddlers, the center shall provide equipment and opportunities for sensory and perceptual experiences, and gross and fine motor development.

B. Infants and toddlers shall spend most of their waking hours outside of the crib, high chair, playpen, or other confining equipment.

C. There shall be periods of time each day when infants and toddlers shall be free to creep, crawl, toddle, and walk.

D. Stimulation shall be regularly provided for infants and toddlers in a variety of ways including being held, talked to, and played with by staff.

E. For awake infants or toddlers or other children who cannot move about unassisted, staff shall change the places and position of the child and the selection of toys or objects available to the child at least every 30 minutes.

§ 6.34

Preschool Activities

The following activities and experiences shall be accessible to preschool children on a daily basis:

1. Creative Expression—For example: painting and drawing; use of scissors and paper; use of paste, clay, fingerpaints; socio-dramatic play using dolls, puppets, felt boards; use of collage materials.

2. Rhythm and Music—For example: listening to, dancing to, singing along with records/tapes; use of instruments such as rattles, bells, shakers, sandpaper blocks, triangles, drums, horns; singing and reciting songs, rhymes, finger plays.

3. Language and Communication Experiences—For example: book and story reading; story-telling; viewing film strips; listening to recorded stories; group discussion; show and tell; use of flannel boards.

4. Sensory Experiences and Nature Exploration—For example: discussion and observation of plants, leaves, weather; observation of and caring for fish and marine life; water play; nature walks; use of toys that stimulate the sense of touch, sight, taste, hearing, and smell; use and observation of wood, soil, sand.

5. Manipulative and Perceptual Experiences—For example: building with blocks, interlocking logs, wooden dowels, wheels with multiple holes; play with nesting and stacking toys, pyramid rings/squares; use of interlocking blocks, cubes, geometric shapes, rings.

6. Social Living—For example: play with child-size household items; imaginative play through the use of dress-up clothes; play with dolls and doll houses, block people, wooden zoo and farm animals; use of puppets and play store items.

7. Tactile and Pre-Quantitative Experiences—For example: play in and measurement of water, sawdust, rice, beans, pebbles, soil; use of pails and shovels, measuring cups and spoons, funnels, pouring devices; availability of hose for siphoning; sponges.

8. Fine Motor Activities—For example: use of puzzles, manipulatives, beads, peg boards, mosaics, parquetry boards, spools; play with small balls, lacing boards, sorting toys; building with dominoes; modeling with clay; use of an abacus.

9. Gross Motor Activities—For example: climbing; balancing on steps, balance board; playing hopscotch; jumping rope; riding on or rolling transportation toys; throwing bean bags, rubber and non-toxic balls; play with punching bags; digging; reaching.

Note: Many activities provide the opportunity to combine several of the interest areas above. For example, a center may make a collage of fall leaves combining 1 and 4. Many of the manipulative and fine motor activities could be the same, etc.

§ 6.35

School Age Activities

A. Children in kindergarten and first grade may be allowed to participate in activities with preschool children.

B. Activities for school age children shall include, but not be limited to, arts, crafts, organized games or sports, reading, field trips, outdoor play.

§ 6.36

**Evening and Overnight Care Activities**

Activities for children in evening or overnight care shall include (as time allows) age-appropriate activities described in § 6.34. Quiet activities and experiences shall be available immediately prior to bedtime.

### Article 7 Activities

§ 6.37

Children of all ages shall be allowed to rest or sleep as needed on cots, beds, or mats.

§ 6.38

Resting or sleeping infants and toddlers shall be checked at least every 30 minutes.

§ 6.39

Centers operating five or more hours per day shall have a designated rest period for preschool children in attendance at the time of the rest period.

A. The designated rest period shall be at least one hour but no longer than two hours unless children are actually sleeping.

B. Cots or beds shall be used during the designated rest period.

### PART VII EMERGENCIES

### Article 1 Specialized Staff Training

§ 7.1

There shall be at least one staff person on the premises during all hours of operation who has received within the past three years a basic certificate in standard first aid (Multi-Media, Personal Safety, or Standard First Aid Modular) from a course approved by the American Red Cross.

Note: Centers that have licenses in effect on April 1, 1986 shall comply with this standard six months after the standards become effective for that facility.

### Article 2 Equipment for Emergencies

§ 7.2

Each building of the center shall have a first aid kit which shall include at a minimum:

1. scissors;
2. tweezers;
3. gauze pads;
4. adhesive tape;
5. band-aids, assorted sizes;
6. an antiseptic cleansing solution;
7. an anti-bacterial ointment;
8. syrup of ipecac (to be used only upon the advice of the physician or the Poison Control Center);
9. bee sting preparation;
10. thermometer; and
11. triangular bandages.

§ 7.3

The first aid kit shall be stored so that it is not accessible to children but is easily accessible to staff.

§ 7.4

A first aid instructional manual shall be kept with each first aid kit at all times.

§ 7.5

**Heating Units**

A. Gas stoves, coal stoves, wood stoves, oil stoves, portable electric heaters, kerosene heaters, and portable heating units of a similar nature shall not be used in the center, except in an emergency such as a power outage in cold weather.

B. When any of the above heating sources is used, physical barriers shall be erected to protect children from injuries.

C. Any heating units used in an emergency shall have been previously inspected and approved by the appropriate fire safety official.

### Article 3 Procedures for Emergencies

§ 7.6

Emergency evacuation procedures shall be posted in a location conspicuous to staff and children in each building of the center.

§ 7.7

The center shall implement these procedures through monthly practice drills and shall maintain a record of the dates of the monthly emergency evacuation drills for one year.

§ 7.8

The following telephone numbers shall be posted in a conspicuous place near each telephone:

1. a physician or hospital;

2. an ambulance or rescue squad service;

3. the local fire department;

4. the local police department;

   Note: If there is a generic emergency number such as, but not limited to, 911 operable in the locality, that number may be posted in addition to the above numbers.

5. a regional poison control center.

§ 7.9

The center will notify the parent immediately in the event of a serious accident or injury and will notify the parents of a minor accident or injury at the end of the day. Written documentation of the type of injury, date, and method of notifying parents shall be kept on file at the center for one year after the injury or accident.

Note: Examples of a serious accident or injury might include unconsciousness; broken bones; deep cut requiring stiches; concussion; foreign object in eye, nose, or ear.

Examples of a minor accident or injury might include a small scratch, cut, or scrape; minor bruise or discoloration of the skin.

APPENDIX I
COMMUNICABLE DISEASE CHART

## Communicable Disease Reference Chart For School Personnel

| Disease | Incubation Period | Signs & Symptoms | Recommendations For Exclusion/Control |
|---|---|---|---|
| Chickenpox (Varicella) | From 2 to 3 weeks, usually 13 to 17 days. | Sudden onset with slight fever and itchy eruptions which become vesicular (small blisters) within a few hours. Lesions commonly occur in successive crops, with several stages of maturity present at the same time. | Communicable for as long as 5 days before eruption of vesicles and for not more than 6 days after the appearance of the first crop of vesicles. Case: Exclude from school for 7 days after eruption. Avoid exposure to women in early pregnancy. Contact: On appearance of first sign or symptom, exclude from school for 7 days. |
| Fifth Disease (Erythema Infectiosum) | From 6-14 days. | Mild illness without fever. Rash characterized by a vivid reddening of the skin especially of the face which fades and returns classically, described as a "slapped cheek appearance." | Case: Exclusion from school not required. Contact: School exclusion not indicated. |
| German Measles (Rubella) | From 14 to 21 days, usually 16 to 18 days. | Mild symptoms; slight fever, rash of variable character lasting about 3 days, enlarged head and neck lymph glands common. Joint pain may occur especially in older children and adults. | Communicable for 7 days before onset of rash and at least 4 days thereafter. Case: Exclude from school for 7 days after onset of symptoms. Avoid exposure to women in early pregnancy. Check immunization records. Contact: Those who are pregnant and not immunized should be urged to seek medical advice. |
| Hepatitis A (Infectious Hepatitis) | From 15 to 50 days, usually 28-30 days. | Fever, loss of appetite, nausea, abdominal discomfort and weakness followed by jaundice. Many unrecognized mild cases without jaundice occur, especially in children. | Communicability greatest from 7 days before to several days after onset of jaundice. Case: Exclude from school until physician advises return. Convalescence may be prolonged. Contact: School exclusion not indicated. |
| Impetigo Contagiosa | Unknown. | Multiple skin lesions usually of exposed areas (e.g., elbows, legs and knees), but may involve any area. Lesions vary in size and shape, and begin as blisters which rapidly mature into brown crusts on a reddened base. Healing from center outwards produces circular areas which may resemble ringworm. | Case: Exclude from school until physician advises return (usually 3-5 days). Contact: Exclusion from school not indicated. Observe carefully for symptoms. |
| Meningitis, Haemophilus | Usually 2-4 days. | Sudden onset of fever, vomiting, lethargy and stiff neck. Progressive stupor or coma are common. | Case: Exclude from school until physician advises return. Contact: School exclusion not indicated. Observe carefully for symptoms, especially fever. Parents of day care/center/nursery school contacts should be advised to check with their childrens physicians concerning prophylactic treatment with rifampin. |
| Meningitis, Meningococcal | From 2 to 10 days, usually 3 to 4 days. | Sudden onset of fever and intense headache. Delirium and coma often appear early; a characteristic measles like rash usually follows. Often fatal despite prompt diagnosis and treatment. | Case: Exclude from school during acute illness. Non-communicable after 24 hours of appropriate drug therapy. Contact: School exclusion not indicated. Intimate (household) contacts should be urged to seek their physician's advice concerning prophylactic treatment with rifampin. |
| Infectious Mononucleosis (Glandular Fever) | Usually 4 to 6 weeks. | Fever, sore throat and enlarged lymph glands of the back of the neck. Generally mild illness and difficult to recognize in children. | Case: Exclude from school until physician advises return. Contact: School exclusion not indicated. |
| Mumps (Infectious Parotitis) | From 2 to 3 weeks, usually 18 days. | Fever with swelling and tenderness of the parotid glands located below and in front of one ear or both ears. Unrecognized mild cases without swelling may occur. | Communicable from 6 days before swelling until 9 days after. Case: Exclude from school until swelling disappears (usually 9 days). Contact: School exclusion not indicated. |
| Pediculosis (Lice) | Under optimum conditions, eggs hatch in 7 days and reach maturity in about 14 days. | Severe itching and scratching, often with secondary infection. Scalp, and hairy portions of body may be affected. Eggs or head lice (nits) attach to hairs as small, round, gray lumps. | Case: Exclude from school until treated by a physician. Contact: Direct inspection of head, body, and clothing recommended. School exclusion not indicated in absence of infestation. |
| Measles (Rubeola, Red Measles) | From 8-13 days, usually 10 days. | Prodrome characterized by fever followed by reddened eyes, runny nose, and cough. Dusky-red blotchy rash appears on day 3 or 4 and lasts 4 to 7 days. | Communicable from beginning of prodromal period to 4 days after appearance of the rash. Case: Exclude from school until at least 4 days after appearance of the rash. Contact: Check immunization records. Exclude from school immediately on signs of prodrome. |
| Salmonellosis | From 6 to 72 hours, usually 12 to 36 hours. | Sudden onset of fever, abdominal pain, diarrhea, nausea, and frequent vomiting. Dangerous dehydration may occur in younger children. | Stools usually positive for Salmonella for several days to several weeks. Occasional patients positive for several months. Case: Exclude from school during acute illness usually 1 to 7 days. Contact: School exclusion and stool cultures not indicated in absence of symptoms. |
| Scabies | From 2 to 6 weeks. | Begins as itchy raised areas or burrows around finger webs, wrists, elbows, armpits, belt-line, and/or genitalia. Extensive scratching often results in secondary infection. | Case: Exclude from school until physician advises return. Contact: Direct inspection of body. School exclusion not indicated in absence of infestation. |
| Scarlet Fever | Usually 1 to 3 days, rarely longer. | Fever, sore throat, exudative tonsillitis or pharyngitis. Rash appears most often on neck, chest, and skin folds of arms, elbows, groin and inner aspect of thighs. | Case: Exclude from school during acute illness usually 7 to 10 days. Non-communicable after 24 hours of appropriate drug therapy. Contact: Exclude from school on appearance of signs or symptoms. Culturing of school contacts and treatment of carriers not usually indicated. |
| Shigellosis (Bacillary Dysentery) | From 1 to 7 days, usually 3 days. | Diarrhea, fever and often vomiting and cramps. In severe cases the stools may contain blood. | Infected cases contagious as long as stools are positive. Case: Exclude from school during acute illness and until cultures of feces are negative. Other children in the family should be cultured. Children who have positive cultures should be excluded until their cultures are negative. Contact: School exclusion not indicated. Stool cultures indicated only in suspected school outbreaks. |
| Whooping Cough (Pertussis) | Usually 7 days, almost uniformly within 10 days, and not exceeding 21 days. | Catarrhal stage begins with upper respiratory symptoms and an increasingly irritating cough. The paroxysmal stage usually follows within 1 to 2 weeks, and lasts 1 to 2 months. Paroxysmal stage is characterized by repeated episodes of violent cough broken by a high-pitched inspiratory whoop. Older school children may not have whoop. Convalescence may require many weeks. | Case: Exclude from school while contagious (usually 2 to 3 weeks, less with antibiotic therapy) and until a physician advises return. Contact: Search for missed or atypical cases. Exclude on first sign or symptom. |

## APPENDIX II
UNITED STATES DEPARTMENT OF AGRICULTURE GUIDE
FOR
CHILD NUTRITION PROGRAMS
BREAKFAST

The minimum amount of food components to be served as breakfast are as follows:

| FOOD COMPONENTS | AGE 1 to 3 | AGE 3 to 6 | AGE 6 to 12[1] |
|---|---|---|---|
| **MILK** | | | |
| Milk, fluid ................. | 1/2 cup[2] | 3/4 cup | 1 cup |
| **VEGETABLES & FRUITS** | | | |
| Vegetable(s) and/or fruit(s) .. OR | 1/4 cup | 1/2 cup | 1/2 cup |
| Full-strength vegetable or fruit juice or an equivalent quantity of any combination of vegetable(s), fruit(s) and juice | 1/4 cup | 1/2 cup | 1/2 cup |
| **BREAD AND BREAD ALTERNATES**[3] | | | |
| Bread ...................... OR | 1/2 slice | 1/2 slice | 1 slice |
| Cornbread, biscuits, rolls, muffins, etc.[4] OR | 1/2 serving | 1/2 serving | 1 serving |
| Cold dry cereal[5] ........... OR | 1/4 cup or 1/3 oz. | 1/3 cup or 1/2 oz. | 3/4 cup or 1 oz. |
| Cooked cereal .............. OR | 1/4 cup | 1/4 cup | 1/2 cup |
| Cooked pasta or noodle products OR | 1/4 cup | 1/4 cup | 1/2 cup |
| Cooked cereal grains or an equivalent quantity of any combination of bread/bread alternative ............... | 1/4 cup | 1/4 cup | 1/2 cup |

[1] Children age 12 and up may be served adult-size portions based on the greater food needs of older boys and girls, but shall be served not less than the minimum quantities specified in this section for children age 6 up to 12.

[2] For purposes of the requirements outlined in this subsection, a cup means a standard measuring cup.

[3] Bread, pasta or noodle products, and cereal grains shall be wholegrain or enriched; cornbread, biscuits, rolls, muffins, etc., shall be made with wholegrain or enriched meal or flour; cereal shall be wholegrain or enriched or fortified.

[4] Serving sizes and equivalents to be published in guidance material by FNS.

[5] Either volume (cup) or weight (oz.), whichever is less.

### LUNCH OR SUPPER

The minimum amounts of food components to be served as lunch or supper are as follows:

| FOOD COMPONENTS | AGE 1 to 3 | AGE 3 to 6 | AGE 6 to 12[1] |
|---|---|---|---|
| **MILK** | | | |
| Milk, fluid ............................. | 1/2 cup[2] | 3/4 cup | 1 cup |
| **VEGETABLES & FRUITS** | | | |
| Vegetable(s) and/or fruit(s) ............:... | 1/4 cup total | 1/2 cup total | 3/4 cup total |

| FOOD COMPONENTS | AGE 1 to 3 | AGE 3 to 6 | AGE 6 to 12[1] |
|---|---|---|---|
| **BREAD AND BREAD ALTERNATES** [3] | | | |
| Bread .................................. | 1/2 slice | 1/2 slice | 1 slice |
| OR | | | |
| Cornbread, biscuits, rolls, muffings, etc.[4] | 1/2 serving | 1/2 serving | 1 serving |
| OR | | | |
| Cooked pasta or noodle products ......... | 1/4 cup | 1/4 cup | 1/2 cup |
| OR | | | |
| Cooked cereal grains or an equivalent quantity of any combination of bread/bread alternative ................................ | 1/4 cup | 1/4 cup | 1/2 cup |
| **MEAT AND MEAT ALTERNATIVES** | | | |
| Lean meat or poultry or fish[5] | 1 oz. | 1 1/2 oz. | 2 oz. |
| OR | | | |
| Cheese ................................. | 1 oz. | 1 1/2 oz. | 2 oz. |
| OR | | | |
| Eggs ................................... | 1 egg | 1 egg | 1 egg |
| OR | | | |
| Cooked dry beans or peas ............... | 1/4 cup | 3/8 cup | 1/2 cup |
| OR | | | |
| Peanut butter or an equivalent quantity of any combination of meat/meat alternate | 2 tbsp. | 3 tbsp. | 4 tbsp. |

[1] Children age 12 and up may be served adult-size portions based on the greater food needs of older boys and girls, but shall be served not less than the minimum quantities specified in this section for children age 6 up to 12.

[2] For purposes of the requirements outlined in this subsection, a cup means a standard measuring cup.

[3] Bread, pasta or noodle products, and cereal grains shall be wholegrain or enriched; cornbread, biscuits, rolls, muffins, etc., shall be made with wholegrain or enriched meal or flour; cereal shall be wholegrain or enriched or fortified.

[4] Serving sizes and equivalents to be published in guidance material by FNS.

[5] Edible portion as served.

## MEAL PATTERNS FOR CHILDREN IN CHILD CARE PROGRAMS

The Child Care Food Program gives Federal aid to child care centers and family and group day care homes. The goal of the program is to improve the diets of children providing them with nutritious, well-balanced meals. This publication is intended to assist large centers with the purchase and preparation of the correct quantities of food. It contains meal patterns, food components, can and jar sizes, and food yields. The following meal patterns contain the minimum food components which must be served in order to be reimbursed by USDA.

| FOOD COMPONENTS | Children 1 up to 3 years | Children 3 up to 6 years | Children 6 up to 12 years |
|---|---|---|---|
| **MILK** | | | |
| Milk, fluid [1] ..................... | 1/2 cup | 3/4 cup | 1 cup |
| Juice or fruit or vegetable ........ | 1/4 cup | 1/2 cup | 1/2 cup |
| Bread and/or cereal, enriched or whole grain: [2] | | | |
| Bread ......................... | 1/2 slice | 1/2 slice | 1 slice |
| Cereal: | | | |
| Cold dry .................... | 1/4 cup [3] | 1/3 cup [4] | 3/4 cup [5] |
| Hot cooked ................. | 1/4 cup | 1/4 cup | 1/2 cup |
| **MID–MORNING OR MID–AFTER-NOON SUPPLEMENT** (Snack) | | | |
| (Select 2 of these 4 components) | | | |
| Milk, fluid [1] ..................... | 1/2 cup | 1/2 cup | 1 cup |
| Meat or meat alternate ........... | 1/2 ounce | 1/2 ounce | 1 ounce |
| Juice or fruit or vegetable ........ | 1/2 cup | 1/2 cup | 3/4 cup |

| FOOD COMPONENTS | Children 1 up to 3 years | Children 3 up to 6 years | Children 6 up to 12 years |
|---|---|---|---|
| Bread and/or cereal, enriched or whole grain:[2] | | | |
| Bread ......................... | 1/2 slice | 1/2 slice | 1 slice |
| Cereal: | | | |
| Cold dry ..................... | 1/4 cup[3] | 1/3 cup[4] | 3/4 cup[5] |
| Hot cooked ................. | 1/4 cup | 1/4 cup | 1/2 cup |

**LUNCH OR SUPPER**

| | Children 1 up to 3 years | Children 3 up to 6 years | Children 6 up to 12 years |
|---|---|---|---|
| Milk, fluid[1] ..................... | 1/2 cup | 3/4 cup | 1 cup |
| Meat or meat alternate:[6] | | | |
| Meat, poultry, or fish, cooked[7] | 1 ounce | 1 1/2 ounces | 2 ounces |
| Cheese ........................ | 1 ounce | 1 1/2 ounces | 2 ounces |
| Egg .......................... | 1 | 1 | 1 |
| Cooked dry beans or peas ...... | 1/4 cup | 3/8 cup | 1/2 cup |
| Peanut butter ................. | 2 tablespoons | 3 tablespoons | 4 tablespoons |
| Vegetable and/or fruit[8] .......... | 1/4 cup | 1/2 cup | 3/4 cup |
| Bread, enriched or whole grain[2] .. | 1/2 slice | 1/2 slice | 1 slice |

[1] Includes whole milk, lowfat milk, skim milk, cultured buttermilk, or flavored milk made from these types of fluid milk which meet State and local standards.

[2] Or an equivalent serving of an acceptable bread product made of enriched or whole grain meal or flour, or enriched or whole grain rice or pasta. See listing in FNS–64. A Planning Guide for Food Service in Child Care Centers, for serving sizes of acceptable bread/bread alternates.

[3] 1/4 cup (volume) or 1/3 ounce (weight), whichever is less.

[4] 1/3 cup (volume) or 1/2 ounce (weight), whichever is less.

[5] 3/4 cup (volume) or 1 ounce (weight), whichever is less.

[6] Or an equivalent quantity of any combination of foods listed under Meat or Meat Alternatives.

[7] Cooked lean meat without bone.

[8] Must include at least two kinds.

## SUPPLEMENTAL FOOD

The minimum amounts of food components to be served as supplemental food are as follows. Select two of the following four components. (Juice may not be served when milk is served as the only other component.)

| FOOD COMPONENTS | AGE 1 to 3 | AGE 3 to 6 | AGE 6 to 12[1] |
|---|---|---|---|
| **MILK** | | | |
| Milk, fluid ................. | 1/2 cup[2] | 1/2 cup | 1 cup |
| **VEGETABLES & FRUITS** | | | |
| Vegetable(s) and/or fruit(s) .. | 1/2 cup | 1/2 cup | 3/4 cup |
| OR | | | |
| Full-strength vegetable or fruit juice or an equivalent quantity of any combination of vegetable(s), fruit(s) and juice | 1/2 cup | 1/2 cup | 3/4 cup |
| **BREAD AND BREAD ALTERNATES**[3] | | | |
| Bread ...................... | 1/2 slice | 1/2 slice | 1 slice |
| OR | | | |
| Cornbread, biscuits, rolls, muffins, etc.[4] ................. | 1/2 serving | 1/2 serving | 1 serving |
| OR | | | |
| Cold dry cereal[5] ........... | 1/4 cup or 1/3 oz. | 1/3 cup or 1/2 oz. | 3/4 cup or 1 oz. |
| OR | | | |
| Cooked cereal .............. | 1/4 cup | 1/4 cup | 1/2 cup |
| OR | | | |
| Cooked pasta or noodle products ...................... | 1/4 cup | 1/4 cup | 1/2 cup |
| OR | | | |
| Cooked cereal grains or an equivalent quantity of any | | | |

| FOOD COMPONENTS | AGE 1 to 3 | AGE 3 to 6 | AGE 6 to 12[1] |
|---|---|---|---|
| combination of bread/bread alternative ............... | 1/4 cup | 1/4 cup | 1/2 cup |
| **MEAT AND MEAT ALTERNA-TIVES** | | | |
| Lean meat or poultry or fish[6] | 1/2 oz. | 1/2 oz. | 1 oz. |
| OR | | | |
| Cheese ..................... | 1/2 oz. | 1/2 oz. | 1 oz. |
| OR | | | |
| Eggs ..................... | 1/2 egg | 1/2 egg | 1 egg |
| OR | | | |
| Cooked dry beans or peas ... | 1/8 cup | 1/8 cup | 1/4 cup |
| OR | | | |
| Peanut butter or an equivalent quantity of any combination of meat/meat alternate .... | 1 tbsp. | 1 tbsp. | 2 tbsp. |

[1] Children age 12 and up may be served adult-size portions based on the greater food needs of older boys and girls, but shall be served not less than the minimum quantities specified in this section for children age 6 up to 12.

[2] For purposes of the requirements outlined in this subsection, a cup means a standard measuring cup.

[3] Bread, pasta or noodle products, and cereal grains shall be wholegrain or enriched; cornbread, biscuits, rolls, muffins, etc., shall be made with wholegrain or enriched meal or flour; cereal shall be wholegrain or enriched or fortified.

[4] Serving sizes and equivalents to be published in guidance material by FNS.

[5] Either volume (cup) or weight (oz.), whichever is less.

[6] Edible portion as served.

## APPENDIX III
### VITAMIN A FOOD SOURCES
SOME FOODS WITH VITAMIN A, VITAMIN C, AND IRON

| Vitamin A | | *Excellent Sources | |
|---|---|---|---|
| Vegetables | | Fruits | Meats |
| Asparagus | Spinach | *Apricots | Liver |
| *Broccoli | *Squash-winter | *Cantaloupe | |
| *Carrots | *Sweet potatoes | Cherries, red sour | |
| Chili peppers (red) | Tomatoes | Papaya | |
| Kale | Tomato juice, | Peaches, (not canned) | |
| *Mixed vegetables | paste or puree | Plums, purple (canned) | |
| *Peas and carrots | *Turnip greens | Prunes | |
| Pumpkin | Vegetable juices | Pumpkin | |
| | | Watermelon | |

## APPENDIX C

### STIPULATIONS

The plaintiffs, Forest Hills Early Learning Center, Inc., Academy Day Care, Inc., and Holloman Child Care Centers, Inc., by counsel, defendant William L. Lukhard, by counsel, and defendant-intervenors Grace Baptist Church, Berean Baptist Church, Tabernacle Baptist Church, and The Rock Church, by counsel, and defendant-intervenors Shenandoah Baptist Church and Pastor Robert L. Alderman, by counsel, submit the following stipulations to be admitted into the evidentiary record in this case.

1. Each of the plaintiffs owns and operates one or more child-care centers in Virginia under license issued by the defendant Lukhard pursuant to *Va. Code* Section 63.-1–196. None of the plaintiffs' centers is operated or conducted under the auspices of a religious institution.

2. Plaintiff Forest Hills Early Learning Center, Inc. is a proprietary corporation that operates a center located in Lynchburg, Virginia.

3. Plaintiff Academy Day Care, Inc. is a non-profit corporation that operates a center in Woodbridge, Virginia.

4. Plaintiff Holloman Child Care Centers, Inc. is a proprietary corporation that operates centers in Hampton and Grafton, Virginia.

5. Defendant-Intervenor Tabernacle Baptist Church ("Tabernacle") operates a child care center in Virginia Beach as part of its ministry. In 1972, Tabernacle considered opening a child care center and contacted state officials to inquire about licensing, which at that time was required of all child care centers under state law. Tabernacle subsequently decided not to pursue a license at that time.

6. Tabernacle contacted the licensing division of the Department of Welfare again in 1976 and was issued a provisional license for a child care center for up to 40 children, ages 2 to 5. After Tabernacle met all the requirements for licensure, a full license was issued it on April 20, 1977. Tabernacle sent a renewal application to the Department of Welfare in May of 1978.

7. On June 2, 1978, Tabernacle returned its license to the Department and advised the Department that it would not accept a renewal license. In its letter to the Department, Tabernacle stated, "[O]ur convictions and beliefs do not allow us to permit anyone but God himself to control, regulate, or dictate to our church. The intrinsic quality or content of licensure is that a higher power may only license a lower power. If we permitted the Commonwealth of Virginia to license the Tabernacle Baptist Church day care center, we believe that we would be giving the state false recognition as a higher power than God himself and this we refuse to do."

8. Between August of 1976 and June of 1978, Tabernacle provided the Department all of the information required in order to establish its compliance with the minimum licensing standards.

9. Tabernacle has operated a nursery and day care center without a license from the state since June of 1978. After the General Assembly in 1979 passed House Bill 276 exempting from licensure child care centers operated under the auspices of a religious institution, the Department determined on or about July 29, 1980, that Tabernacle's day care center met the requirements of the exemption statute, *Va. Code* Section 63.1–196.3. Since the passage of House Bill 276, Tabernacle has filed annually the documents required by the exemption statute.

10. Defendant-Intervenor Berean Baptist Church of Salem, Virginia operates a preschool and kindergarten program as part of its church ministry. In December, 1972, Reverend Rudy Holland, Pastor of Berean, contacted the licensing division of the Department to inquire about the requirements for licensure and was sent the minimum standards for licensed child care centers. Because Berean encountered zoning problems with its facility, it was unable to open its center in the fall of 1973.

11. After its zoning problems were resolved, Berean applied for a license from the state in the summer of 1974, as required at that time by state law. Berean was issued a provisional license for its day care center and kindergarten for forty-five children ages 2 to 12 in September of 1974 and was issued a regular license on October 9, 1974, for a twelve-month period.

12. Berean's license was renewed in December of 1975 and again in January 1977 for a period of six months.

13. In June of 1977, counsel for Berean advised the Department of Welfare that Berean objected to the licensing of its nursery and day care center, stating that "the Berean Christian Academy and Day Care Center is operated as an integral part of the Berean Baptist Church of Salem, Virginia. All the ministries of the Berean Baptist Church are conducted and exist by declaration of the convictional faith of this church. As I am sure you can appreciate, the licensing of the Berean Christian Academy for day care purposes would require the licensing of an integral ministry of the Berean Baptist Church." *See* Defendant-Intervenors' Exhibit 14 Grace Baptist Church, et al.

14. Between July, 1974 and June, 1977, Berean provided the Department of Welfare all of the information required to establish its compliance with the minimum licensing standards.

15. From June, 1977 to the present, Berean has operated its preschool program without a license. On August 17, 1979, the Department of Welfare advised Berean that it had met the statutory requirements of the newly-passed statute exempting Berean and other church-run child care programs from state licensure.

16. Grace Baptist Church of Petersburg, Virginia has operated a child care center exempted from licensure by *Va. Code* Section 63.1–196.3 since on or about April of 1984. In that time, Grace Baptist Church has complied with the requirements of the exemption statute.

17. The Rock Church in Virginia Beach, Virginia has operated a child care center exempted from licensure by *Va. Code* Section 63.1–196.3 since August of 1980. In that time, The Rock Church has complied with the requirements of the exemption statute.

18. Defendant-Intervenor Shenandoah Baptist Church ("Shenandoah") operates a preschool in Roanoke County, Virginia as a part of the ministry of the church.

19. In 1973, Shenandoah applied for a license to operate a preschool. Shenandoah was granted a provisional license for the period November 15, 1973 through April 14, 1974, after which a regular license was issued. Shenandoah's preschool remained licensed through February, 1978. During that time period, Shenandoah provided to the Department all of the information required to establish its compliance with the Minimum Licensing Standards.

20. On February 4, 1978, Shenandoah returned its license to the Department of Welfare stating as follows: "Having examined carefully the significance of the licensing procedure of the Department of Welfare in relationship to our children's ministries, we are convinced that we have violated one of our basic Biblical and Constitutional principles in applying for and accepting your license for the purpose of operating a church ministry."

21. Since February, 1978, Shenandoah has conducted its preschool without a license. Since the passage of House Bill 276, Shenandoah has filed documents required by the exemption statute.

22. As of October 31, 1986, there were 837 licensed child care centers in Virginia, 151 exempt centers, and 68 centers that have notified the state of their intention to operate an exempt center. Among the 837 licensed centers, approximately 106 are church-run centers.